Henry LERMAN, Plaintiff,

v.

DIAGNOSTIC DATA, INC., a Delaware Corporation, Defendant.

Court of Chancery of Delaware, New Castle County.

Submitted Sept. 8, 1980.
Decided Sept. 23, 1980.

David A. Drexler and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiff.

Bruce M. Stargatt and Jack B. Jacobs of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant.

BROWN, Vice Chancellor.

This is an action brought by a dissident shareholder who, along with others, is attempting to wage a proxy contest so as to elect a slate of directors in opposition to those nominated for the board by management. As a result of certain amendments to the defendant corporation's by–laws which were accomplished after incumbent management was on notice of plaintiff's intention to wage a proxy contest, it has now become impossible for the plaintiff and his compatriots to literally comply with the amended by–laws, the requirements of which impose conditions which must be met before opposition candidates can qualify for election to the board of directors at the annual meeting. As such, the outcome of this action is necessarily governed by the scope of the Delaware Supreme Court's ruling in *Schnell v. Chris–Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971), and it therefore seems appropriate at the outset to briefly review that decision so as to establish the principles to be applied to the facts set forth hereafter.

## I.

In *Schnell*, as it is by now well known to those involved with Delaware corporation law, it was held that inequitable action by management in amending corporate by–laws so as to change the date of the annual meeting did not become permissible simply because it was legally possible. There, with knowledge that an insurgent group wished to wage a proxy contest in an effort to replace incumbent management, the board of the defendant corporation amended the by–laws so as to enable it to move up the date of the annual meeting of shareholders. The by–laws had fixed the meeting date for the second Tuesday in January. On October 16, 1971 a committee of shareholders filed with the Securities and Exchange Commission its intention to wage a proxy battle. On October 18, 1971 Chris–Craft's board met and did two things. First, it amended the by–laws so as to permit the annual meeting to be held at any time during the two–month period from December 1 through January 31, with the board to designate the precise date. Secondly, the board then fixed the date of the meeting for December 8, 1971. It also fixed the place of the meeting at a comparatively remote location in upstate New York.

In this Court, Vice Chancellor (now Chancellor) Marvel concluded on the facts of record that incumbent management had "seized on a relatively new section of the Delaware Corporation Law for the purpose

of cutting down on the amount of time which would otherwise have been available to plaintiffs and others for the waging of a proxy battle." *Schnell v. Chris–Craft Industries, Inc.*, Del.Ch., 285 A.2d 430 (1971). Nonetheless, after noting that the plaintiff and his group had been contemplating their open challenge for many months prior to the sequence of events described above, but that they had chosen to talk and negotiate their position rather than to take affirmative action sooner, the Court concluded at 285 A.2d 437 that the plaintiffs

". . . slow approach toward a battle designed to oust management is outweighed by management's technical compliance with the law having to do with the calling of an annual meeting."

Accordingly, plaintiffs' application to preliminarily enjoin the December 8, 1971 meeting, and to have the Court reset it for the second Tuesday in January 1972 in compliance with the former by–law, was refused.

On appeal, that determination was reversed by a 2 to 1 decision of the Delaware Supreme Court. It was stated for the majority as follows at 285 A.2d 439:

"In our view, those conclusions [of the then Vice Chancellor] amount to a finding that management has attempted to utilize the corporate machinery and the Delaware Law for the purpose of perpetuating itself in office; and, to that end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. These are inequitable purposes, contrary to established principles of corporate democracy. The advancement by directors of the by–law date of a stockholders' meeting, for such purposes, may not be permitted to stand. Compare *Condec v. Lunkenheimer Company*, Del.Ch., 230 A.2d 769 (1967).

"When the by–laws of a corporation designate the date of the annual meeting to stockholders, it is to be expected that those who intend to contest the reelection of incumbent management will gear their campaign to the by–law date. It is not to be expected that management will attempt to advance that date in order to obtain an inequitable advantage in the contest."

In voicing his dissent to the decision of the majority, then Chief Justice Wolcott stated as follows at 285 A.2d 440:

"I do not agree with the majority of the Court in its disposition of this appeal. The plaintiff stockholders concerned in this litigation have, for a considerable period of time, sought to obtain control of the defendant corporation. These attempts took various forms.

"In view of the length of time leading up to the immediate events which caused the filing of this action, I agree with the Vice Chancellor that the application for injunctive relief came too late."

Against this precedential backdrop, I turn to the facts of this case as established at trial.

## II.

The defendant Diagnostic Data, Inc. (hereafter "DDI") is a Delaware corporation headquartered in California. It was formerly a California corporation which was reincorporated under Delaware law. It is engaged in the development and manufacture of certain federally regulated ethical pharmaceutical products. DDI owns a patent on a drug named "Orgotein" which it believes operates to substantially alleviate, if not cure, the painful symptoms associated with rheumatoid arthritis. In fact DDI's president, Monroe G. Smith, states that it has been established to DDI's satisfaction that their drug will cure almost any kind of inflammation, with no side effects to the patient.

DDI has been working on the development of this drug for a number of years and it feels that it is on the verge of receiving federal approval so as to place it on the market in the United States. The drug is presently marketed on a limited basis in certain foreign countries, but as yet DDI has not been granted a license from the Food and Drug Administration. Its present business derives from selling certain horse

food additives. From this line it has gross sales of some $3 million, with a net profit somewhere in the vicinity of $500,000. At the same time, as a publicly held corporation having 4,446,110 shares issued and outstanding, its stock was trading over the counter at $17 per share at the time of trial. This would indicate a shareholder value of over $70 million in a corporation grossing $3 million per year from the manufacture and sale of horse food additives. Its future, therefore, would seem to be dictated by the long sought–after, and hopefully forthcoming, licensing of Orgotein. In this respect, DDI takes on the appearance of a ship laden with gold, lying in the harbor waiting to be unloaded once it is cleared for docking.

These circumstances have undoubtedly generated interest in DDI's management and control. At least it has caused the plaintiff Lerman, a DDI shareholder of many years, along with certain other shareholders assembled as part of his group, to seek to place in nomination a slate of candidates for the board of directors in opposition to those nominated by management. DDI has taken the position that Lerman's slate is ineligible for election based upon the following sequence of events.

In January 1980 Russell Teasdale, Secretary and General Counsel to DDI, attended a seminar at which, among other things, there was a discussion concerning "anti–takeover" precautions that could be undertaken on behalf of a corporation by its management. Teasdale, in turn, discussed this with Smith, DDI's president, and as a result, during late January or early February 1980, a California law firm was retained by DDI for the purpose of revising its by–laws.

During late March, 1980 the plaintiff Lerman and three others made Schedule 14B filings with the Securities and Exchange Commission, thereby giving notice of their intention to wage a proxy contest at the next annual meeting of DDI. DDI was advised of this by letter of March 28, 1980 from Jay J. Miller, Lerman's New York attorney. At that time, according to DDI's

existing by–laws, the annual meeting was to be held on the third Thursday in June of each year.

On April 8, 1980 DDI's board of directors met for the purpose of reviewing and adopting the proposed revision of the by–laws. The revised copy of the by–laws was delivered to the board for the first time on the day of the meeting. The board was unable to complete its task on that day. As a result, it met again on April 21, 1980, at which time the amended by–laws were formally adopted.

The amended by–laws contained two changes which are of significance here. First, as in *Schnell v. Chris–Craft Industries, Inc., supra,* the by–law fixing the annual meeting for the third Thursday in June was repealed in favor of one which left the date of the annual meeting to the discretion of the board of directors. Secondly, a new provision, known as Section 14, Article III, was added. This by–law is said to be virtually identical in its requirements to those imposed by Schedule 14B of the Securities and Exchange Commission in that it requires that the corporation be given, in writing, certain personal and professional information concerning a person who is being nominated as a candidate for the board of directors by anyone other than management itself. The by–law adds a requirement not contained in Schedule 14B that information also be provided concerning the proposed nominee's standing as a competitor of DDI as well as his or his family's affiliation with competitors of DDI. This additional requirement is not in issue here even though it was not complied with in the materials which were ultimately sent to the corporation by Lerman. The element of Section 14 of the by–laws that is in issue, however, is its added requirement that such information be submitted to the secretary of the corporation, in writing, "not less than seventy days prior to any meeting of stockholders called for the election of directors." This portion of the challenged by–law is hereafter referred to as "the 70 day requirement."

On April 30, 1980, Teasdale wrote to Miller, counsel for Lerman and the three others. Along with this letter, Teasdale forwarded a copy of Section 14 of the amended by–laws so as to make Miller aware of the new requirements for board nominations, including the 70–day requirement. The full content of that letter is as follows:

"Enclosed is a copy of Article III, Section 14 of the Company's By–laws. The annual meeting of the Company has not been called for June, so that your client(s) will have time to submit nominations as required by the By–laws. After May 19, 1980, the Board will consider setting a record date and calling the annual meeting, whether or not nominations have been received from your client(s). If your client(s) do not wish to submit nominations, please notify me of that fact so that the Board can proceed to consider setting a record date and calling the annual meeting.

"The By–laws are intended to provide a fair notification procedure so that shareholders can be fully informed regarding the names and qualifications of nominees during the solicitation of proxies from shareholders. Floor nominations and substitutions of nominees are inconsistent with that procedure and will not be permitted."

On May 7, 1980 Miller replied by letter, stating that he felt the new by–law provision to be illegal. He viewed it as "an effort to thwart shareholders in the exercise of their rights as such." He requested that he be provided with a full set of the new by–laws so that he might further analyze the matter. He stated that he did not feel that he could be in a position to respond by the May 19 deadline set forth in Teasdale's letter. A complete set of the amended by–laws was never sent to Miller by DDI, although he did obtain a copy during June from another source.

On May 9, 1980 Smith, DDI's president, sent a letter to all DDI shareholders. The full content of that letter is as follows:

"Enclosed please find the annual report for our fiscal year which ended February 29, 1980. We hope you find it informative. The real purpose of this letter is to advise you that our Board of Directors has not yet set a date for our annual meeting. The reason for this delay is because we feel a meeting will be much more informative when we can at least give some meaningful answers to the two burning questions we know are uppermost in your mind.

"First: Where do we stand insofar as a U.S. licensee is concerned?

"We hope to have an 'agreement in principle' with a major U.S. pharmaceutical company within the next 30 days, so we should be able to give reasonable answers when we have a shareholders meeting.

"Second: Where do we stand insofar as the FDA is concerned?

"This is a much more difficult response. Prior to a shareholders meeting, we will have re–filed our New Drug Application (NDA) and in the annual report I have outlined the reasons for this re–filing being so tardy. We can't promise any answers from the FDA, or even any timetable for a response. We will be able to tell you about the NDA, our requests made to the FDA, and any deductions we may have concluded as a result of any informal conversations with the FDA.

"*We won't attempt to hazard a guess for the meeting date at this time, as that will be determined based on events. However, you will receive ample notice once we can set a meeting date.*" (Emphasis added.)

Also under date of May 9, 1980 (based upon a stocklist which he says he was able to accumulate over a period of time) Lerman himself wrote to all shareholders of DDI. He advised that he and other shareholders had formed a committee as a result of their dissatisfaction with DDI's management and that they would possibly be soliciting proxies later after complying with Securities and Exchange Commission requirements. Thereafter, according to Lerman, he set about to enlarge and firm up his

slate of nominees. Matters remained uneventful until mid–July. Then they developed in rapid progression.

On July 14, 1980 Teasdale set notice to DDI's directors that a meeting of the board was being called for August 1, 1980. On this same date, pursuant to 8 *Del.C.* § 220, Lerman executed a statement to DDI, coupled with a letter from Miller, his attorney, demanding an inspection of DDI's list of shareholders for the purpose of conducting a proxy fight for the election of directors at the next annual meeting. On the following day, July 15, Teasdale confirmed a reservation with the Fairmont Hotel in San Francisco reserving facilities for the purpose of an annual meeting of shareholders on October 3, 1980. By letter of July 23, 1980 Teasdale responded to Miller, Lerman's attorney, advising that Lerman's demand for a stocklist had been reviewed by Smith and that it would be subsequently discussed with the directors at the August 1 board meeting. Treating this as a rejection of his demand, Lerman went forward with summary proceedings in this Court pursuant to § 220 and eventually was granted the right to a stocklist as a result of a hearing held on August 11, 1980.

By July 23, 1980, or shortly thereafter, Lerman and his committee had put together all the papers that they felt were required to be filed with the Securities and Exchange Commission by their nominees. During the interim, two of those who had made the March filings had withdrawn while the total number of nominees had been increased from four to thirteen. Along with a letter dated July 29, 1980, Miller enclosed a copy of the SEC filings made on behalf of the insurgent slate and address the envelope to DDI. In his accompanying letter, Miller advised that each nominee "proposes to be a nominee for election at the next Annual Meeting of Shareholders of DDI." He specifically advised that the materials were being supplied as a convenience to DDI, and that by so doing no concession or waiver was being made as to the validity of the amended by–laws. By a separate letter, also dated July 29, 1980, Miller replied to Teasdale's July 23, letter concerning Lerman's stocklist demand, advising that DDI's response contained therein was unsatisfactory.

These two letters were mailed by Miller's law office in New York. From the evidence, I am now satisfied that although each envelope contained a certified mail sticker, both envelopes were deposited in the mails without having the benefit of any postage affixed to them. In due course they were returned to Miller's office, and were remailed, this time with postage. The missive containing the information as to Lerman's nominees was remailed on August 12, 1980 and was received by DDI in California on August 15, 1980.

In the meantime, DDI's board had met on August 1, 1980 as scheduled and, not being aware of any filings made by Lerman by that time in purported compliance with Section 14 of the amended by–laws, the board fixed October 3, 1980 as the date for the annual meeting. That date is 63 days from the date of the board meeting at which it was established. The action taken by the board in fixing the date thus made it impossible for Lerman or any other shareholder to comply with the 70–day requirement of the by–laws subsequent to that time.

In this suit that followed (the complaint being amended to bring it in line with the foregoing events, some of which developed after suit was filed) Lerman contends, first, that the 70–day requirement is unreasonable and invalid on its face, and, secondly, that the amendments to the by–laws so as to add the 70–day requirement and to permit the directors of DDI to fix the annual meeting date as they saw fit, when coupled with the events that have transpired, reveal inequitable conduct designed to perpetuate incumbent management in office even if the action taken was legally permissible, and that under the rationale of *Schnell v. Chris–Craft* it cannot be permitted to stand so as to defeat Lerman's right to have his slate of nominees voted upon by DDI's shareholders. DDI contends that *Schnell* is not applicable because, the board not being aware of Lerman's written submission of

nominees until some two weeks after the meeting date was already set, there is no evidence that its action in fixing the meeting date was intended to thwart or hinder Lerman's efforts. I analyze the problem in the following manner.

## IV.

First of all, what are the differences between this case and the situation in *Schnell v. Chris–Craft*? In *Schnell*, the incumbent board amended the by–laws to do away with the established, annually–recurring meeting date in such a manner as to give the board the power to fix the date anywhere within a two–month span. Then the board advanced the date forward one month from the former by–law date so as to allow the insurgent shareholders only some six weeks, as opposed to more than two months, in which to wage a proxy battle. This was found to be inequitable conduct designed to thwart the efforts of the challenging shareholders. The supposed justifications for the action taken by the incumbent board were found unpersuasive.

Here, the situation is somewhat different. Here, also with notice that certain shareholders were intending at the time to wage a proxy battle, the incumbent board amended the by–laws so as to do away with the established, annually–recurring meeting date in favor of a provision which permitted the board to fix the date as it saw fit. However, rather than advancing the date as was the case in *Schnell*, DDI's board utilized its newly bestowed power to extend the meeting date indefinitely. And its president so advised all shareholders. Later, however, and a considerable time beyond the formerly established annual meeting date, DDI's board proceeded to fix and announce an annual meeting date 63 days thereafter in the face of its other accompanying by–law amendment which required nominees other than those selected by management to submit their intention, together with supporting information, at least 70 days in advance of the annual meeting.

By comparison, the inequitable action taken in *Schnell* had the effect of hindering the efforts of the challengers by severely curtailing the time in which they had to comply with Securities and Exchange Commission requirements, to contact shareholders, etc. It did not put the challengers out of business but, the Supreme Court found, it unfairly hindered their ability to present their position to the shareholders within the allotted time, and, because it was intended to do so, this was found to be wrong. Here, the action taken by DDI's board, whether designedly inequitable or not, has had a terminal effect on the aspirations of Lerman and his group. If the board's action is permitted to stand, they, along with any other DDI shareholder who secretly might have been harboring similar intentions, are completely out of business. From the date the board used the power of the amended by–law to fix the date of the annual meeting there was no way in which a DDI shareholder could possibly comply with the accompanying 70–day requirement of Section 14 of the amended by–laws. And this, I think, must clearly determine the issue.

I realize that DDI's position has certain factors on its side. It points out that it initiated the by–law revisions before being aware of any challenge from Lerman and his associates; that it forwarded a copy of the new Section 14 to Lerman's attorney promptly; that it advised Lerman, through his attorney, that it would give him an opportunity to comply with Section 14, and thus the 70–day requirement, before fixing a meeting date; that it delayed from May through August 1 before deciding upon the October 3 date, all of which afforded Lerman more than ample opportunity to comply with the 70–day requirement and that as of the time that the date was fixed it was not aware that Lerman had attempted to mail written notice of his group's intention but had failed to place postage on the letter.

It further argues that Section 14 has a justifiable purpose in that it feels 45 days to be an ideal time for the solicitation of proxies, with the remaining 25 days being available to allow management to screen the previously unknown nominees and to possi-

bly permit some accommodation between competing factions before the proxy materials are mailed, thus potentially reducing expense to all, and possibly avoiding a contest. DDI argues that this was its purpose in adopting Section 14, and it denies that it was specifically adopted to thwart the intentions of the challengers as was the case in *Schnell*, something it says is evident from the time and assistance it afforded Lerman.

Also, as DDI contends, Lerman could have avoided the circumstance in which he finds himself. In addition to having three months in which to comply with Section 14 in advance of the establishment of the meeting date, he knew on or about July 14, through private market sources, that DDI was calling a directors' meeting some two weeks thereafter, and he knew that the fixing of an annual meeting date was something that was likely to occur at that meeting. He had the Securities and Exchange Commission materials of his nominees either in hand or available to him for several days prior to the abortive mailing attempt on July 29. He could have mailed them sooner. (Of course, with no postage it probably would have made little difference.) Moreover, by Teasdale's letter to his attorney of April 30, 1980 Lerman had been asked, in effect, to let DDI's board know whether or not he and his group intended to submit nominations in compliance with Section 14, but he never did so.

On the other side of the matter, however, it cannot be denied that DDI adopted Section 14 as part of its by-laws with full knowledge of Lerman's intentions. And it was, as DDI's president acknowledged, adopted as one of the antitakeover precautions to be inserted in the revised by-laws. The revisions also removed the established annual meeting date against which Lerman was working when he made his initial Schedule 14B filings.

Of even more significance, I cannot help but note that when DDI's board met on August 1, 1980 it was with knowledge that Lerman had filed a demand under 8 *Del.C.* § 220 some two weeks before, and had thereafter filed a suit in this Court, to obtain a stocklist for the express purpose of waging a proxy contest for the election of directors at DDI's forthcoming annual meeting. I think it also of some significance that on July 23, 1980, when Teasdale wrote to Miller to advise that Lerman's stocklist demand would be discussed at the August 1 board meeting, it was eight days after Teasdale had confirmed the October 3 reservation with the Fairmont Hotel for the purpose of holding the annual meeting. Yet no indication was given to Lerman that the clock might be running on the time which he had remaining to comply with Section 14.

DDI concedes that under *Schnell* its action would be indefensible if DDI's board had knowledge as of August 1, 1980 that Lerman had mailed materials on July 29, 1980 in possible compliance with Section 14. It argues, however, that the 70-day requirement of the by-law is not unreasonable on its face, and that it is not a by-law which, *per se*, operates unreasonably. It argues that the by-law did not operate unreasonably here. To the extent that it may have thwarted Lerman, DDI contends, it was caused by Lerman's willingness to let matters slide until it was too late, and not as a result of deliberate action by the board to cut him off. As such, DDI argues that this is not a situation wherein the board took action through a by-law change so as to stop or hinder a proxy fight as was the case in *Schnell*. Be that as it may, however, I conclude that *Schnell* dictates a contrary result.

Aside from the main holding that inequitable conduct by management cannot become permissible simply because it is legally possible, I read *Schnell* as containing two supporting propositions. And I make reference to the quotations from the Supreme Court decision set forth at the outset hereof.

█ For one, as to the argument that Lerman had plenty of time to have acted so as to avoid the terminal effect of the establishment of the meeting date resulting from the by-law amendment, that was the consideration which prompted Chancellor Mar-

vel to rule against the challengers in this Court in *Schnell*, and it was also the basis for Chief Justice Wolcott's dissent in the Supreme Court on appeal. Having failed to prevail in that case, it cannot, as a legal concept, prevail here under similar circumstances. I read that result to mean even though one desiring to engage in a proxy contest had ample time to do so, and could have avoided the deleterious effect of a by–law amendment by management by acting sooner, it cannot serve to excuse the conduct of management if that conduct was both inequitable (in the sense of being unnecessary under the circumstances) and had the accompanying dual effect of thwarting shareholder opposition and perpetuating management in office.

Secondly, as Lerman argues, to combine such a 70–day advance submission requirement with an indefinite annual meeting date to be fixed in the discretion of management has the effect of requiring those who would seek to wage a proxy challenge to remain in a constant state of readiness so as to have their materials and nominees available to go whenever management decides to drop the flag. "Shelf–readiness" is how Lerman refers to it, i.e., having all papers and filings prepared in advance and on the shelf so as to be able to pull them down and make the deadline once the meeting date is set.

■ The quotation from *Schnell* set forth earlier states that when the by–laws designate the date of the annual meeting to stockholders, it is to be expected that those who intend to contest the reelection of incumbent management will gear their campaign to the by–law date, and that it is not to be expected that management will attempt to advance that date in order to obtain an inequitable advantage in the contest. I read this to mean that a by–law amendment authorizing a change in a fixed–annual meeting date to a date to be established by management cannot be put into operation in such a manner that those wishing to wage a proxy fight are required to be in a state of "shelf–readiness" in order to meet a sudden advancement of the date.

If this be true, then how can the implementation of such a by–law change be upheld if the fixing of the date, when coupled with a by–law such as the 70–day requirement here, has the effect, not so much of giving management an inequitable advantage, but of removing the insurgents from the contest altogether even if they had been "shelf–ready"? I fail to see how this could be, even if management understandably lacked knowledge of all the facts and had no intention of thwarting a potential proxy contest in so doing.

## V.

■ Accordingly, in summary, I do not address the question of whether the 70–day requirement is unreasonable, and thus invalid, on its face. I hold only that under the facts of this case the act of DDI's board, in fixing the date for the annual meeting at a time 63 days in the future, in the face of a by–law which required the plaintiff Lerman and his group to submit the names of their nominees, together with information concerning them, to the corporation at least 70 days in advance of the date of the annual meeting of shareholders, is invalid and cannot be permitted to stand so as to prevent the plaintiff and his group from placing the names of their candidates in nomination.

Counsel are to be complimented on the vigorous and professional manner in which the case was presented on short notice. It was a good case. The next item of business is an immediate conference to discuss the form of order to be entered.