### ACCIPITER LIFE SCIENCES FUND, L.P., Plaintiff,

v.

### Ricki Tigert HELFER, John E., Maupin, Jr., Owen G. Shell, Jr., Dewitt Ezell, Jr., William V., Lapham, Kenneth C. Donahey, Richard H. Evans, Michael P., Haley, and LifePoint Hospitals, Inc., Defendants.

### C.A. No. 2057–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 16, 2006.
Decided: Aug. 2, 2006.

---

**46.** New Castle County, Del., Code art. 5, ch. 2, § 2.05.201(1)(a) (2005).

**47.** *Id.* at § 2.05.201(2).

**48.** *Id.* at § 2.05.201(3).

**49.** *Id.* at § 2.05.201(4).

**50.** *See id.* at § 2.05.201(1)(a)-(4).

Joel Friedlander, Esquire, John M. Seaman, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Thomas J. Fleming, Esquire, Jeffrey A. Udell, Esquire, Olshan Grundman Frome Rosenzweig & Wolosky LLP, New York, New York, Attorneys for the Plaintiff.

Donald J. Wolfe, Jr., Esquire, Kevin R. Shannon, Esquire, Brian C. Ralston, Esquire, Kirsten A. Lynch, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Robert C. Myers, Esquire, James P. Smith, III, Esquire, John E. Schreiber, Esquire, Dewey Ballantine LLP, New York, New York, Attorneys for the Defendants.

## OPINION AND ORDER

LAMB, Vice Chancellor.

A corporation announced its annual stockholder's meeting in a press release devoted mainly to financial results. A substantial stockholder failed to thoroughly read the document, failed to notice the stockholder meeting announcement, and thus failed to realize that, under the corporation's advance notice bylaw, it had ten days from the date of that public announcement to nominate a slate of directors to the board. It discovered its mistake two months later when its then belated attempts to nominate candidates were rebuffed for tardiness. It then sued to overturn the results of the uncontested election.

The stockholder concedes that two of its employees read the document on the day it was released, that those employees would have understood the disclosure to require haste had they read the crucial paragraph, and that it could have met the ten-day deadline. Nevertheless, it seeks equitable relief setting aside the election, claiming that the company's decision to place the announcement of the annual meeting in that particular press release constituted an inequitable manipulation of the corporation's election machinery. Largely because the important annual meeting announcement was readily and easily available, the court rejects that argument and grants summary judgment in favor of the defendants.

## I.

### A. The Parties

Accipiter is a self-described hedge fund based in New York which focuses its investments on companies in the healthcare sector. It consists of five full-time employees, including the General Partner, Gabe Hoffman, and Nicole Viglucci, the senior analyst responsible for covering LifePoint Hospitals, Inc. Accipiter, either directly or through affiliates, purports to own approximately 1.4% of LifePoint's shares.

LifePoint is a Delaware corporation engaged in providing healthcare services in rural communities. It was established on May 11, 1999, as a spin-off of HCA, Inc. The eight individual defendants comprise all of the members of LifePoint's board of directors. One of these directors, Kenneth C. Donahey, is a member of management. The remaining seven directors are independent of the corporation.

### B. The Facts

#### 1. LifePoint's Advance Notice Bylaw

LifePoint's bylaws require that the board of directors set the date of the corporation's annual stockholders meeting. In the past, the board has usually scheduled that meeting around the anniversary of LifePoint's creation. Thus, LifePoint's first four annual meetings were held on May 11, 2000, May 14, 2001, May 14, 2002, and May 21, 2003. That regular schedule was disrupted by various circumstances in both 2004 and 2005, when the meetings were held on June 15 and June 30, respectively.[1]

The procedure that stockholders must follow if they wish to nominate candidates to the board of directors or to submit stockholder proposals is set forth in Section 11 of the corporation's bylaws. LifePoint's default rule is that a stockholder's proposal or nomination of directors is timely if it is delivered to the corporation "not less than 90 days prior to the first anniversary of the preceding year's annual

---

1. Carpenter Aff. ¶¶ 4–5.

meeting of stockholders."[2] On those occasions where the date of the annual meeting is advanced by more than 30 days from the previous year's anniversary, or is delayed more than 60 days from that anniversary, however, a different rule applies. As set forth elsewhere in Section 11:

> If the date of the annual meeting is advanced more than 30 days prior to or delayed more than 60 days after such anniversary date, notice by the stockholder to be timely must be delivered not later than close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made.[3]

The bylaw further defines public announcement as "disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service or in a document publicly filed" with the SEC.[4]

### 2. *The 2006 Meeting Date*

When the LifePoint board began compiling its calendar for 2006 and 2007 in the fall of 2005, the proposed date for the 2006 annual meeting was May 8, harking back to the early May annual meeting date of previous years. That initial plan was confirmed when, in mid-January 2006, LifePoint and its outside counsel prepared an annual meeting timeline that envisioned filing the company's SEC Form 10–K by February 6, at the same time LifePoint would release its earnings for the fourth quarter and year-end of 2005.[5] The board was informally scheduled to approve the May meeting date, and the record date for the annual meeting, at a meeting on February 23, 2006.[6] Presumably, had that schedule been adhered to, the company would have announced its annual meeting shortly thereafter.

These plans changed when LifePoint received the first stockholder proposal in its history on January 12, 2006, submitted by Amalgamated Bank LongView MidCap 400 Index Fund.[7] The proposal was forwarded to the company's outside legal counsel, Waller Lansden Dortch & Davis, which was in the process of preparing the proxy statement for the 2006 annual meeting. On February 1, 2006, an associate at the Waller firm suggested in an internal email that LifePoint should immediately announce its annual stockholder meeting date, which would trigger LifePoint's advance notice bylaw, and require all further stockholder proposals to be submitted within 10 days of that announcement.[8] Later, a senior partner at the firm passed the associate's suggestion to Bill Carpenter, the chief governance officer of LifePoint.[9]

Carpenter was receptive to the idea. As he testified at his deposition, although he claimed that his goal was to "identify the universe of stockholder proposals that . . . would have to be included in [LifePoint's 2006 annual] proxy statement,"[10] his preference was to receive no additional stockholder proposals.[11] Therefore, he decided to authorize an addition to the earnings

---

2. Ralston Aff. DX 13.

3. *Id.*

4. *Id.* at 6.

5. Friedlander Aff. Ex. 8.

6. *Id.* at LPNT00249.

7. Carpenter Aff. ¶ 7.

8. Ralston Aff. Ex. I.

9. Carpenter Dep., Ralston Aff. Ex. D, 15:10–14.

10. Carpenter Aff. ¶ 13.

11. Carpenter Dep., Ralston Aff. Ex. D, 78:7–8.

press release due to be released on February 6 to announce the May 8 annual meeting. Carpenter forthrightly testified at his deposition that he could not remember making any special effort to determine whether such proposed action complied with Delaware law or SEC regulations, but rather concentrated on complying with the terms of the company's bylaws.[12] Nor did he remember considering whether a separate press release announcing the new date of the stockholder meeting might be more appropriate than merely adding a paragraph announcing the meeting date to the earnings release.[13]

Acting on that authorization, Mary Kim Shipp at LifePoint wrote to the Waller firm on February 2, 2006, and explained that Carpenter wanted to "add a sentence to our earnings release that announces the date of the annual meeting in order to cut off the time for any additional shareholder proposals."[14] Later the same day, Shipp wrote to the Waller firm again, adding that the announcement could be placed at the end of the earnings release, just before the boilerplate language preceding the financial tables.[15] An associate at the Waller firm responded that afternoon, with sample language that omitted the fact that setting an annual meeting date in May would trigger the ten-day provision of the advance notice bylaw, and therefore set a close deadline for the submission of any further stockholder proposals. The associate explained, "[w]e don't think a deadline for shareholder proposals should be mentioned, as that would only seem to invite

them."[16] Carpenter approved the language on February 6, 2006, the very morning that the earnings release was scheduled to be sent out.[17]

### 3. *The February 6 Press Release And Form 8–K Filing*

LifePoint's announcement that its annual meeting would be held in May was included in the February 6 press release, which was issued publicly on that day and also filed as an attachment to a SEC Form 8–K.[18] In both cases, the title of the document refers only to the corporation's fourth quarter and year-end results. In the format provided to the court, the press release consists of 11 pages of combined text and financial results. The first five paragraphs of the release discuss the company's improved fourth quarter and year-end 2005 results. The sixth paragraph announces the existence of a listen-only simul-cast of the company's February 7 financial results conference call with analysts. The seventh paragraph, near the bottom of the first page, is the text at issue in this case and is reproduced here in full:

> LifePoint's 2006 Annual Meeting of Stockholders will be held on May 8, 2006, at 3:00 p.m. local time, at 511 Union Street, Suite 2700, Nashville, Tennessee. The record date for the meeting will be March 17, 2006.

The eighth paragraph of the release includes only a standard description of LifePoint's business. It is followed by a subheading designating the text below it as

---

12. *Id.* at 38–39.

13. Carpenter Dep., Ralston Aff. Ex. D, 30.

14. Ralston Aff. Ex. H.

15. Friedlander Aff. Ex. 1.

16. Ralston Aff. Ex. J.

17. Friedlander Aff. Ex. 2. Although the plaintiff presents no argument as to this point, the court notes with some surprise that the record does not reflect that this decision was ever approved or ratified by LifePoint's board of directors.

18. Ralston Aff. DX 2.

"important legal information," which is followed by a long paragraph of standard boilerplate disclaimers. Together, that text covers no more than a page and a half in the form presented in the evidence.[19] The financial tables disclosing the details of LifePoint's results immediately follow, and continue for ten pages.

### 4. Accipiter's Attempt To Nominate Director Candidates

Accipiter's Hoffman and Viglucci were awaiting the February 6 earnings report and accompanying press release. Both testified that they likely read the report on or about the day it was released.[20] Importantly, Hoffman expressly testified that if he had seen the language announcing the annual meeting when he first read the document, he would immediately have understood that Accipiter then had ten days to nominate an insurgent slate of directors:

> [H]ad I seen it, had it not been buried, had it been displayed more prominently, as is generally the case, it would have been very important and I would have seen it, I believe ... [Viglucci] and I had ... decided at least a month previously that we were definitely becoming activists ... [a]nd so something like this, considering I had read the information in the proxy prior to this ... would have triggered ... [an understanding that] we've got ten days [to make our nominations].[21]

It is further unchallenged that had either Viglucci or Hoffman read the disclosure, and thus understood that they had ten days to make their nominations, Accipiter could have complied with that deadline.

Indeed, Accipiter makes no challenge to the length of time provided by Section 11 for nominations.

Despite the separate paragraph announcing the meeting, however, both Hoffman and Viglucci claim they did not notice it. Indeed, Viglucci testified that, in accessing the financial information, she skimmed all the text up to the announcement of the webcast, skipped the one, hidden[22] paragraph that announced the annual meeting, and continued at the financial tables that followed:

> I did not read the entire release. . . . I skimmed through the commentary on the financial results, however, I didn't focus on it, that's not important, it just summarizes all the financial data. I care more about looking at the actual numbers. . . .[23]

She attempted to explain the curious fact that even in skimming she failed to notice an entire separate paragraph announcing the corporation's annual meeting by noting that she read the announcement on a Bloomberg screen, where the text is presented in an unfriendly format, and the critical paragraph was actually on the third screen of the document.[24]

Hoffman, for his part, testified that he could not remember reading the particular press release in question, but that he would have done so because LifePoint was a company in which Accipiter is invested, and that he would have read it on February 6, the day it was released.[25] Hoffman explained, however, that after erroneously identifying the particular section of the press release in which the annual meeting

19.  Id.

20.  Hoffman Dep., Ralston Aff. Ex. B, 46–47; Viglucci Dep., Ralston Aff. Ex. A, 30–31.

21.  Hoffman Dep., Ralston Aff. Ex. B, 48–49.

22.  Viglucci Dep., Ralston Aff. Ex. A, 34:2–5.

23.  Id., Ex. A, 31–33.

24.  Ralston Aff. Ex. A, 30:8–11.

25.  Id., Ex. B, 42–44.

date was disclosed as irrelevant,[26] he likely spent most of his time reading the financial results, and thus failed to see the crucial disclosure.[27] This was because, in his view, financial professionals cannot be expected to read every single word of every company's press release, but rather read those parts of the press release they deem relevant, and skip those they recognize as unimportant to their goals.[28]

The defendant does not challenge either Hoffman's or Viglucci's veracity, which is supported by documents produced as part of the record.[29] The court must take as true, therefore, that both of these highly experienced financial analysts simply did not read the text of the February 6 press release in full, and thus remained ignorant until April that the annual meeting date had been set.

Unaware of the new meeting date and thus also unaware of the fact that the time for making director nominations had run, in mid-March 2006 Hoffman and Viglucci embarked on nominating a slate of director candidates. They retained a proxy solicitor and outside counsel, and set out their concerns about LifePoint's management in a letter from Hoffman to LifePoint dated March 24, 2006.[30] Accipiter assembled a slate of nominees and submitted a formal notice of nominations to LifePoint on March 31, 2006.[31] Accipiter issued its nomination letter as a press release on the morning of April 4, 2006.[32] On April 4, 2006, Carpenter faxed a letter to Accipiter stating that its notice of nomination of candidates was not "timely delivered to LifePoint,"[33] based on the new annual meeting date set out in the February 6 press release. Accipiter filed suit on April 10, 2005. On April 25, 2006, this court denied Accipiter's request for preliminary injunctive relief noting the availability of speedy equitable relief.

## II.

The plaintiff's case revolves, as noted above, around LifePoint's February 6 press release. In Accipiter's view, by late January 2006, LifePoint was beset by poor earnings and dissatisfied stockholders. When it received the Amalgamated stockholder proposal, LifePoint's management decided to foreclose any further attempts by stockholders to assert power over the ailing company by triggering the advance notice bylaw in as obscure a way as possible while still formally complying with its responsibilities under the bylaws to announce its plans publicly. Accordingly, LifePoint chose to "bury" the announcement in the seventh paragraph of a purportedly 34–page (when viewed on a Bloomberg screen) press release, strategically placing this crucial information in the midst of boilerplate legal text, and in any case just before vital financial results on which LifePoint knew stockholders would concentrate their efforts.

That this was LifePoint's goal, Accipiter argues, is plainly evidenced by Shipp's and Carpenter's communications with their outside counsel, which show LifePoint's

---

**26.** *Id.* at 82–84.

**27.** *Id.* at 39–44.

**28.** Hoffman Dep., Ralston Aff. Ex. B, 82–84.

**29.** The record shows that Hoffman and Viglucci were apparently surprised to discover in April that the nomination period had already run. *See, e.g.,* Ralston Aff. DX 17.

**30.** Friedlander Aff. Ex. 17.

**31.** Ralston Aff. DX 23.

**32.** Friedlander Aff. Ex. 21.

**33.** *Id.* at Ex. 22.

care to place the annual meeting announcement "at the end" of the earnings announcement, show LifePoint's clear desire to foreclose further stockholder proposals, and show that Carpenter undertook no due diligence to ensure that what he was doing complied with federal and state laws. In Accipiter's view, LifePoint could have announced its meeting in any number of other ways: by a separate press release, or by including the announcement of the annual meeting in the headline of the press release or in the caption of the Form 8–K. Rather than take those easy steps, Accipiter claims that LifePoint intentionally obscured its announcement, and that its efforts succeeded when Accipiter failed to notice that ten-day window for stockholder proposals and nominations began running on February 6.

Accipiter concedes there was nothing confusing about the language of the disclosure, and concedes that, if the relevant personnel at Accipiter had seen the disclosure, they would have understood its meaning, would have immediately been aware of the need to nominate its slate within ten days, and would have been able to meet that deadline. Thus, Accipiter's claim is essentially limited to its assertion that there was something so fundamentally wrong about where and how LifePoint announced its annual meeting date that the company necessarily violated its implied duties of good faith and fair dealing, the relevant SEC regulations,[34] and, most importantly, the standard of equitable behav-

ior set forth in *Schnell v. Chris–Craft*[35] and its progeny. Therefore, the plaintiff claims, the court should grant summary judgment in its favor, and order a new election of directors to LifePoint's board.

The defendants emphasize that no one at LifePoint had so much as heard of Accipiter, or knew of any potential proxy contest, before Accipiter's April announcement. Moreover, LifePoint argues that the only explanation for LifePoint's decision to announce its annual meeting on February 6 was to identify the universe of possible stockholder proposals. That is, LifePoint disclaims even the idea that Carpenter meant to cut short further stockholder proposals. Thus, the defendants argue that LifePoint can hardly be blamed if the extremely sophisticated plaintiff, with its eyes closely fixed on their company, missed an obvious announcement placed in a discrete paragraph on the first page of an important press release. On that basis, the defendants argue that no material facts remain in dispute between the parties, and that they should be granted summary judgment.

### III.

It is well known that summary judgment under Court of Chancery Rule 56 will be granted where the moving party demonstrates that there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.[36] Similarly, the court may enter judgment in favor of the non-moving

---

34. The relevant language is that contained in Rule 14a–5(f): "If the date of the next annual meeting is subsequently advanced or delayed by more than 30 calendar days from the date of the annual meeting to which the proxy statement relates, the registrant shall, in a timely manner, inform shareholders of such change ... [by including a notice in its earliest possible Form 10–Q] or, if impracticable, [by] any means reasonably calculated to in-

form shareholders." The plaintiff believes that LifePoint's announcement fails under this standard. Pl.'s Answering Br. 34.

35. 285 A.2d 437 (Del.1971).

36. *Haas v. Indian River Volunteer Fire Co.*, 2000 WL 1336730, 2000 Del.Ch. LEXIS 116 (Del.Ch. Aug. 14, 2000), *aff'd*, 768 A.2d 469 (Del.2001).

party where the state of the record is such that the non-moving party is clearly entitled to such relief.[37]

■ The parties' post-argument supplemental letters dispute whether summary judgment is an appropriate in this case. In sum, although Accipiter believes it is entitled to summary judgment, and believed the facts of record were appropriate for relief at the preliminary injunction stage, its June 14, 2006 letter asserts that it will be able to prove at trial that Carpenter's intent was to disclose the annual meeting obscurely, so as to escape the notice of stockholders. Accipiter believes that this allegation, which LifePoint disputes, is a material fact at issue precluding summary judgment in favor of LifePoint.

The court agrees with Accipiter that it cannot conclude, at this stage, that Carpenter's motivation was benign. On the contrary, the facts of record clearly evidence Carpenter's desire to avoid further stockholder proposals, and show that his advisors suggested including the annual meeting date in the February 6 press release for that very purpose. In that context, LifePoint's claim that Carpenter acted only to define the universe of possible proposals cannot form the basis for a summary judgment. Nonetheless, there is no evidence in the record to support the further inference that the actual language used to disclose the meeting date, the placement of that disclosure in the earnings release, or the absence of headings or captions was part of a plan to make the

announcement so obscure as to escape all attention. On the contrary, the disclosure conveys the required information in plain English, in simple declarative sentences, and in a separate paragraph on the first page of an important press release. Similarly, there is no evidence that either Carpenter or anyone else actively chose to omit mention of the meeting date from the caption of either the press release or the Form 8–K. Rather, what the undisputed record shows is that the Form 8–K and the February 6 press release were already drafted when LifePoint's counsel raised the possibility of including the annual meeting announcement in the press release. When Carpenter approved that action in order to limit stockholder proposals, the critical extra paragraph was hastily inserted into the already prepared text. In the circumstances, there is no material issue of fact regarding Carpenter's state of mind that would preclude entry of summary judgment.

## IV.

■ The court first notes that several of the plaintiff's arguments are simply inapt. Whether or not LifePoint violated SEC Rule 14a–5(f) in the way that it announced its annual meeting, this court lacks jurisdiction to enforce that rule.[38] More pertinently, to the extent that Rule 14a–5(f) would apply to these facts in a securities law case, that provision contains no bright line rule like the one the plaintiff favors, but rather sets out an undefined standard

---

37. *Stroud v. Grace,* 606 A.2d 75, 81 (Del. 1992); *Bank of Delaware v. Claymont Fire Co. No. 1,* 528 A.2d 1196, 1199 (Del.1987).

38. As the plaintiff observes, conduct violative of the federal securities law may also breach the implied covenant of good faith and fair dealing, or other Delaware law. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 18 (Del.2001) ("Common law and 10b–5 both provide relief for the same wrong—in other words, just because 10b–5 provides a remedy [it] will not preempt the common law and, similarly, that common law permits recovery will not bar a 10b–5 suit. Contract claims and securities claims arising out of the same operative facts may co-exist."). That fact does not make federal law relevant to a claim under *Schnell,* however.

of disclosure by "any means reasonably calculated" to inform stockholders. That vague requirement adds nothing to the court's analysis of either the LifePoint bylaw or to the general scheme of Delaware law.

■ As to the plaintiff's claim that Life-Point violated its implied covenant of good faith and fair dealing, that assertion adds nothing to Accipiter's claims in equity. As this court has observed, "the contract doctrine of an implied covenant of good faith and fair dealing may be thought in some ways to function analogously to the fiduciary concept." [39] Given the cases discussed below, that analogy is particularly strong here.

■ This leaves the plaintiff's argument on equitable grounds.[40] There is, of course, no dispute as to the plaintiff's fundamental point. Delaware corporations may not take actions towards their stockholders which, though legally possible, are inequitable. The source of that standard is *Schnell v. Chris–Craft*,[41] where the Supreme Court held that a board's facially legal use of a bylaw to cut short the time available for stockholders to conduct a proxy contest was inequitable, and thus impermissible. That precedent is a cornerstone of Delaware law, and has repeatedly been reaffirmed by our courts.

■ As this court has held, however, the equitable power to set aside a board's action under *Schnell* "must be invoked sparingly and only when circumstances make relatively clear that inequitable behavior or manipulation is present." [42] As the Supreme Court has cautioned in holding that equitable principles are distinct from rights under statutory appraisal:

> While [*Schnell*] is an important part of our jurisprudence, its application, or that of similar concepts, should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right.[43]

In the specific context of advance notice bylaws, *Schnell* has been understood to mean that such bylaws must on their face

---

**39.** *HB Korenvaes v. Marriott Corp.*, 1993 WL 205040, *6, 1993 Del.Ch. LEXIS 90, *17 (Del. Ch. June 9, 1993).

**40.** Neither the so-called "constructive notice" or "buried facts" doctrines, debated at some length by the parties, are relevant to this case. The defendants rely on the former to argue that any information available in public SEC filings should be imputed to Accipiter, and therefore that Accipiter's claims are precluded by the fact that the annual meeting was announced in a Form 8–K. While Accipiter's inexplicable failure to properly read the February 6 press release is important to this court's decision this is only because the annual meeting date was disclosed in an obvious (to the diligent) way with no motive to disable a proxy contest. Similarly, to the extent that Accipiter's "buried facts" argument is an independent reason on which to base relief rather than an answer to LifePoint's invocation of constructive notice, it is plain that courts have restricted that doctrine to circum-

stances that far surpass those in this case. In *Weingarden & Stark v. Meenan Oil Co.*, 1985 WL 44705, *3, 1985 Del.Ch. LEXIS 374, *9–10 (Del.Ch. Jan. 2, 1985), for example, on which the plaintiff relies, this court approvingly cited a federal court's decision that a material disclosure in a *footnote* on the next to last page of a prospectus was inadequate. A disclosure in a separate paragraph on the first page of a short press release is another matter entirely. *See Kohn v. American Metal Climax, Inc.*, 322 F.Supp. 1331, 1348 (E.D.Pa. 1970) (holding facts to be buried "in view of the length and complexity of the explanatory materials").

**41.** 285 A.2d at 437.

**42.** *Dolgoff v. Projectavision, Inc.*, 1996 WL 91945, *7, 1996 Del.Ch. LEXIS 24, *23 (Del. Ch. Feb. 29, 1996).

**43.** *Alabama By–Products Corp. v. Neal*, 588 A.2d 255, 258 n. 1 (Del.1991).

and in the particular circumstances "afford the shareholders a fair opportunity to nominate candidates."[44] This matter of "basic fairness" requires relief where inequitable conduct "interferes with a fair voting process."[45]

In deciding whether an act is an inequitable restraint on the stockholder's franchise, this court has looked closely at the circumstances of each case. Obviously, our courts have been more likely to find an action impermissible if the board acted with the intent of influencing or precluding a proxy contest for control of the corporation. Thus, in *Schnell* itself, there was no doubt that the board acted in the face of an SEC filing declaring the proxy group's intention to nominate directors.[46] And in *Lerman v. Diagnostic Data, Inc.,*[47] the court emphasized in its decision to invalidate the setting of an annual meeting the fact that the board acted with "full knowledge of [the dissident's] intentions" to launch a proxy contest.[48] Other important cases in the *Schnell* line also depended in some part on the fact that the board acted with the intention of maintaining control of the corporation.[49] In *Aprahamian v. HBO & Co.,*[50] for example, this court granted relief where the board decided to postpone the annual stockholders meeting only *after* discovering that it was likely to lose a proxy contest.[51]

None of this is to say that relief from an inequitable bylaw is dependent on a finding of scienter. In *Linton v. Everett,* for example, this court observed that intent was not necessarily a part of a claim under *Schnell:* "to set aside election results on the basis of inequitable manipulation of the corporate machinery, it is not required that scienter, i.e., actual subjective intent to impede the voting process, be shown."[52] The reason that neither knowledge of an impending proxy contest nor scienter was necessary in *Linton,* however, was that the facts at issue there were quite extraordinary.

To summarize those "highly unusual" circumstances, the *Linton* court was confronted with a situation where a corporation had not held an annual meeting in three years. When the board did finally call a meeting to elect all three classes of directors, as it was required to do under Delaware law, it triggered the company's advance notice bylaw. That provision required stockholders wishing to make director nominations to provide notice of their intentions within ten days of the mailing of the notice of the meeting. But the plaintiff stockholders testified that they had only received their mailed notice three days before the deadline. Thus, as the court observed, the only way the stock-

44. *Hubbard v. Hollywood Park Realty Enters.,* 1991 WL 3151, *11, 1991 Del.Ch. LEXIS 9, *35 (Del.Ch. Jan. 14, 1991).

45. *Linton v. Everett,* 1997 WL 441189, *9, 1997 Del.Ch. LEXIS 117, *11 (Del.Ch. July 31, 1997).

46. 285 A.2d at 439.

47. 421 A.2d 906 (Del.Ch.1980).

48. *Id.* at 913.

49. *See also Hubbard,* 1991 WL 3151, 1991 Del.Ch. LEXIS at 9. Although the issue in *Hubbard* turned, as discussed herein, on the fact that a material change had occurred in the company's strategic plan after the deadline imposed by an advance notice bylaw, part of the court's holding in that case centered around the fact that the company had twice used its advance notice bylaw in the context of known proxy contests. *Id.* at *2–3, 1991 Del.Ch. LEXIS at *8–9.

50. 531 A.2d 1204 (Del.Ch.1987).

51. *Id.* at 1208–09.

52. 1997 WL 441189, at *9, 1997 Del.Ch. LEXIS 117, at *29.

holders could have participated in the highly important election for control of the corporation was to have maintained a full slate of directors ready to be nominated on a hair trigger, on the off chance that at any moment in three years of inactivity, the corporation might call its statutorily required meeting. The unreasonableness of that requirement, as the court explained, "constituted an inequitable manipulation of the election process."[53]

All the other cases on which the plaintiff relies, and which constitute the chief progeny of *Schnell*, were based on similarly extraordinary facts. In *Hubbard*, for example, the chief reason that the advance notice bylaw at issue was found to be inequitable was that after the nomination deadline had passed, the leading dissident agreed to join the board, abandoned its proxy contest, and succeeded in radically changing the board's strategic plan. Thus, the court observed, the key facts on which a stockholder could choose to nominate candidates were "inherently unknowable until after the nomination deadline had expired."[54] And in *Lerman* a court granted relief where a sitting board of directors set the annual meeting at a time 63 days in the future, in the face of a bylaw that

required a stockholder wishing to nominate directors to submit the names of its nominees at least 70 days in advance of the meeting.[55] Thus, the board's action made compliance with the bylaw literally impossible, depriving the stockholders of any access to the ballot.[56] In these and the other cases discussed herein, it was well within this court's equitable power to provide the stockholders with relief.[57]

■ The facts in this case fall far short of the types of inequity which our courts have found determinative in the past. Most obviously, this case differs entirely from most of our previous cases on point because no one at LifePoint had reason to know of Accipiter's intention to trigger a proxy contest when Carpenter made the decision to announce the company's annual meeting. Unlike *Aprahamian*, or *Schnell*, or *Lerman*, the defendants here did not act with the specific intent to limit the stockholder's rights to nominate and elect a dissident slate. Rather, as in *Dolgoff*, "the board was not faced with a proxy contest or an expected proxy contest when it took action," nor did it "advance or delay the meeting after it had already been called."[58] To the extent that Carpenter's

---

53. *Id.* at *10, 1997 Del.Ch. LEXIS 117, at *35.

54. *Hubbard*, 1991 WL 3151, at *11, 1991 Del. Ch. LEXIS 9, at *36.

55. 421 A.2d at 914.

56. *Id.* at 912.

57. *See also Schnell*, 285 A.2d at 437 (holding a board's decision to advance the date of an annual stockholders meeting to be inequitable because the dissident stockholders had geared their campaign towards an already announced meeting date, and because between the short time allowed by the advanced meeting, the exigencies of SEC approval, and the board's decision to hire several proxy firms, the dissident had little chance to prepare a proxy contest); *Aprahamian*, 531 A.2d at

1208 (noting that the postponement of the annual meeting "might well defeat the efforts of plaintiffs and the will of the majority of the stockholders" because of the considerable sums of money the dissident stockholder had already expended on the contest).

58. 1996 WL 91945, at *8, 1996 Del.Ch. LEXIS 24, at *24–25. The plaintiff attempts to distinguish *Dolgoff* by pointing out that the claim in that case "challenged the setting of an annual meeting date, not the triggering of an advance notice by-law." Pl.'s Answering Br. 29. For the purposes of an analysis under *Schnell*, however, there is no obvious or relevant difference between those two scenarios. A corporation may act inequitably either by triggering its advance notice bylaw, or equally by setting an annual meeting date in a way that precludes a fair proxy contest.

intent to limit stockholder proposals is relevant to the court's conclusion, the analysis below—finding that LifePoint's actions are not of the gravity forbidden by *Schnell*—is determinative.

The gravamen of Accipiter's case is that the form of LifePoint's annual meeting announcement violated Delaware law by making important corporate information more difficult to discover than was necessary. There is some appeal to that argument resulting from the sense of discomfort the February 6 press release engenders. Clearly, the annual meeting announcement would have been completely unmistakable had LifePoint specifically included it in the caption of either the press release or the Form 8–K, or had it issued a separate press release to that effect. Even a separate subheading in the press release alerting readers to the additional topic would have considerably improved the quality of LifePoint's disclosure.

Thus, the court shares Accipiter's concerns about the manner and form of LifePoint's annual meeting announcement. Further, this court does not lightly approve a process which was intended to limit the rights of some stockholders, and which had the incidental, and indirect, effect of precluding a contested election for the board. While this case has some of the hallmarks of the *Schnell* line of cases, however, LifePoint's concededly troubling way of announcing its annual meeting does not reach the standard required for equitable relief. LifePoint's actions did not, as in *Linton* or *Schnell*, make the dissident's challenge extremely difficult or impossible. Nor did material facts arise after the nomination period ended, as in *Hubbard*. Importantly, unlike the cases detailed above, all Accipiter needed to do to preserve its rights was read the company's press release carefully and in full. This is in contrast to *Lerman*, for example, where in order to preserve its rights to nominate directors, the dissident stockholder would have had to anticipate that the company would call its annual meeting in a way that would make further nominations impossible. As this court rightly held in *Hubbard*, where the defendant went so far as to claim that the plaintiff should have anticipated that the initial dissident might seek an accommodation with the board, and thus deprive a second set of dissidents of a contested election, stockholders are not required to be clairvoyant.[59] The burden LifePoint's announcement placed on Accipiter, however, was not of this kind.

■ The reason this court grants the defendants' motion for summary judgment, therefore, is not that the court views LifePoint's method of disclosure with approbation, but that its equitable powers can only be roused under *Schnell* where compelling circumstances suggest that the company unfairly manipulated the voting process in such a serious way as to constitute an evident or grave incursion into the fabric of the corporate law. To rule in the plaintiff's favor here, where the record shows that Accipiter could easily have preserved its rights with reasonable diligence, would extend *Schnell* well beyond those limits and would threaten to involve the court in matters better understood as regulatory in nature. The rules the court would arrive at, exercising such regulatory oversight, might, on occasion, be wise. And yet, such rulemaking is inconsistent with precedent, and with this court's limited powers in equity to prevent the deprivation of a clear right by improper manipulation.

## V.

For the foregoing reasons, the defendants' motion for summary judgment is

---

**59.** 1991 WL 3151, at *11, 1991 Del.Ch. LEXIS 9, at *35.

GRANTED. The parties shall bear their own costs. IT IS SO ORDERED.