**JANA MASTER FUND, LTD., Plaintiff,**

**v.**

**CNET NETWORKS, INC., Defendant.**

**Civ.A. No. 3447–CC.**

Court of Chancery of Delaware.

Submitted: March 3, 2008.
Decided: March 13, 2008.

46. *I.e.*, IT IS SO ORDERED.

Martin P. Tully, David J. Teklits, James D. Honaker, and Kevin M. Coen, of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; of counsel: Marc Weingarten and William Cassin, of Schulte Roth & Zabel, LLP, New York City, for Plaintiff.

Donald J. Wolfe, Jr., Kevin R. Shannon, and Brian C. Ralston, of Potter Anderson & Corroon, LLP, Wilmington, DE; of counsel: Robert C. Myers and Richard W. Reinthaler, of Dewey & Leboeuf, LLP, New York City, for Defendant.

## OPINION

CHANDLER, Chancellor.

The storm of words in this case, which ranged in rhetorical heft from allusions to Lewis Carroll's *Through the Looking Glass*[1] to incantations of "the bloody shirt of *Blasius*,"[2] has proven to be a tempest in a teapot. For reasons I explain below, I have determined that the unambiguous language of the bylaw at the heart of this case renders the bylaw inapplicable to nominations and proposals plaintiff JANA Master Fund seeks to put forth at the annual meeting of defendant CNET Networks. Consequently, I need not and do not address the hypothetical validity of the bylaw were it to operate as CNET contended it would.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff JANA Master Fund, Ltd. ("JANA"), an investment fund, owns with its affiliates approximately eleven percent of the outstanding common stock of defendant CNET Networks, Inc. ("CNET").[3] CNET, a Delaware corporation, is an interactive media company whose ventures include news.com, MP3.com, GameSpot, ZDNet, and Urban Baby. CNET has a staggered, eight-member board, and two of the current directors are up for reelection this year. Motivated by what it per-

---

1. *See* Pl.'s Reply Br. at 1.

2. *See* Hr'g Tr., Mar. 3, 2008; *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch. 1988).

3. Recent news reports indicate that JANA and its affiliates' stake in the company has increased to 21%. *See Jana Meets With CNet and No Love Is Lost, Report Says*, N.Y. TIMES DEALBOOK, Mar. 10, 2008, at http://dealbook.blogs.nytimes.com/2008/03/10/jana-meets-with-cnet-and-no-love-is-lost-report-says/.

ceives to be poor financial performance on the part of CNET stock, JANA seeks to replace the two current directors, expand the size of the board from eight to thirteen, and nominate five individuals to fill the newly created positions. Such actions, if successful, will result in a new majority in control of the board of CNET.

On December 26, 2007, JANA wrote to CNET to advise the current board of its intention to solicit proxies from the other CNET shareholders in favor of its nominees and proposals and to request inspection of stocklist materials pursuant to section 220 of the Delaware General Corporation Law for the purpose of communicating with shareholders and for soliciting proxies. On January 3, 2008, CNET responded by letter and refused to provide the requested stocklist materials. CNET took the position that JANA failed to state a proper purpose because JANA's proposed proxy solicitation violated provisions of the company's bylaws.[4] Specifically, CNET's letter cited JANA's "fail[ure] to comply with the provisions of the Company's bylaws which require a stockholder seeking to nominate candidates for director election or seeking to transact other corporate business at an annual meeting to beneficially own $1,000 of the Company's common stock for at least one year."[5]

JANA reasonably assumed that this sentence referred to two sections of the CNET bylaws: Article III, Section 6, entitled "Nominations for Directors," and Article II, Section 3, entitled "Notice of Annual Meeting." Because JANA made its initial investment in CNET in October 2007, JANA will have held shares of the company for only eight months at the time of the meeting if CNET holds its annual meeting in June 2008 as expected. If the bylaw provisions apply to JANA's proposals and nominations, JANA will be unable to bring them to the attention of shareholders at the 2008 meeting.

On January 7, 2008, JANA filed a complaint with this Court that seeks a declaration either that the bylaws are inapplicable to JANA or that CNET's interpretation of the bylaws is invalid. JANA concomitantly filed a motion to expedite, and the parties later agreed to advance the case by way of a motion for judgment on the pleadings with an abbreviated briefing schedule. The parties concluded briefing on this motion on February 29, 2008, and the Court heard oral argument on March 3, 2008.

## II. BYLAWS

Although JANA initially thought that CNET contended two separate provisions of the company bylaws operated to prevent JANA's proposals, CNET ultimately conceded that the "Nominations for Directors" bylaw of Article III, Section 6 did not apply. Instead, CNET argues that the so-called "Notice Bylaw" of Article II, Section 3 governs both shareholder nominations for directors and other shareholder proposals. This provision provides, in part:

> Any stockholder of the Corporation that has been the beneficial owner of at least $1,000 of securities entitled to vote at an annual meeting for at least one year may seek to transact other corporate business at the annual meeting, provided that such business is set forth in a written notice and mailed by certified mail to the Secretary of the Corporation and received no later than 120 calendar days in advance of the date of the Corpora-

---

**4.** CNET later reversed course and granted JANA access to the stocklist.

**5.** Compl. Ex. C.

tion's proxy statement released to security-holders in connection with the previous year's annual meeting of security holders (or, if no annual meeting was held in the previous year or the date of the annual meeting has been changed by more than 30 calendar days from the date contemplated at the time of the previous year's proxy statement, a reasonable time before the solicitation is made). Notwithstanding the foregoing, such notice must also comply with any applicable federal securities laws establishing the circumstances under which the Corporation is required to include the proposal in its proxy statement or form of proxy.

Thus, the language indicates that a shareholder must have owned stock in CNET for a full year before it "may seek to transact other corporate business" under this provision.

JANA contends that this provision does not or cannot apply to its nominations and proposals. First, JANA argues, this bylaw only applies to nominations and proposals made under Rule 14a–8 of the federal securities laws;[6] i.e., this bylaw only governs nominations and proposals a shareholder wishes to have included on management's form of proxy. Because JANA intends to independently finance its own proxy materials, it claims this bylaw is inapplicable. Second, JANA suggests that

if this bylaw can be read to apply, it is invalid under Delaware law because it is an unreasonable restriction on shareholder franchise.

CNET takes the opposite position, arguing that the bylaw is both applicable and valid. First, CNET cites the plain language of the provision, which it says contains nothing that limits the scope of the bylaw's requirements to proposals and nominations under Rule 14a–8. Second, CNET argues that this bylaw is valid because it was adopted by the shareholders of the corporation[7] and reasonably serves a valid corporate purpose.

## III. STANDARD OF REVIEW

■ JANA has moved for judgment on the pleadings pursuant to Rule 12(c).[8] The Court may grant judgment on the pleadings where no material facts are in dispute and where the moving party is entitled to judgment as a matter of law.[9] Because "[a] trial is merely a vehicle for the act of fact finding,"[10] no trial is necessary when only a legal issue confronts this Court. Because a corporation's bylaws and charter are contracts among its shareholders, and because the construction of a contract is purely a question of law, judgment on the pleadings is an appropriate mechanism for resolving the present dispute over CNET's bylaws.[11]

---

**6.** Shareholder Proposals Rule, 17 C.F.R. § 240.14a–8 (2008).

**7.** The bylaw was adopted by CNET before the company's IPO, when there were apparently very few shareholders, all but one of whom were management.

**8.** Ct. Ch. R. 12(c).

**9.** *Robbins Hose Co. No. 1, Inc. v. Baker*, C.A. No. 2247–VCP, 2007 WL 3317598, at *4 (Del. Ch. Oct. 31, 2007). Additionally, the Court

must "view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del.1993).

**10.** *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 829 (Del.Ch.2007).

**11.** *See Sassano v. CIBC World Markets Corp.*, C.A. No. 3066–VCL, 2008 WL 152582, at *5 (Del.Ch. Jan. 17, 2008).

 Of course, the construction of the bylaw is a purely legal question only if the bylaw itself is unambiguous.[12] Should the Court conclude that a contract is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings," it is ambiguous, and the Court must consult extrinsic evidence.[13] Nevertheless, mere disagreement among the parties does not somehow create ambiguity.[14] Under the objective theory of contracts, this Court will grant relief on a motion for judgment on the pleadings if a contract's language is "unmistakably clear" as viewed from the vantage of a reasonable third party.[15] To the extent there is any ambiguity in interpreting bylaws, "doubt is resolved in favor of the stockholders' electoral rights."[16]

## IV. ANALYSIS

 The language of the Notice Bylaw leads to only one reasonable conclusion: the bylaw applies solely to proposals and nominations that are intended to be included in the company's proxy materials pursuant to Rule 14a–8. One may parse the bylaw as follows: (1) notice of CNET's annual meeting will be provided to stockholders sometime between ten and sixty days before the meeting is held;[17] (2) any stockholder who has owned $1,000 of stock for at least a year before the meeting may seek to transact other corporate business at the meeting;[18] (3) to do so, that stockholder must send the CNET secretary notice of what business he/she plans to conduct a certain number of days before CNET needs to send out its proxy materials;[19] and, finally, (4) in addition, such

---

**12.** *See United Rentals,* 937 A.2d at 830.

**13.** *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).

**14.** *Seidensticker v. Gasparilla Inn, Inc.,* C.A. No. 2555–CC, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007).

**15.** *Id.; W. Ctr. City Neighborhood Ass'n v. W. Ctr. City Neighborhood Planning Advisory Comm., Inc.,* C.A. No. 19557–NC, 2003 WL 241356, at *6 (Del.Ch. Jan. 24, 2003) (interpreting bylaws under this objective standard).

**16.** *Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd.,* 924 A.2d 228, 239 (Del.Ch.2007); *see also Centaur Partners, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 927 (Del.1990) ("There exists in Delaware 'a general policy against disenfranchisement.' ") (quoting *Blasius Indus. v. Atlas Corp.,* 564 A.2d 651, 669 (Del.Ch.1988)); *Harrah's Entm't, Inc. v. JCC Holding Co.,* 802 A.2d 294, 310 (Del.Ch.2002) ("When a corporate charter is alleged to contain a restriction on the fundamental electoral rights of stockholders under default provisions of law … it has been said that the restriction must be 'clear and unambiguous' to be enforceable. The policy basis for this rule of construction rests in the 'belief that the shareholder franchise is the ideological underpinning upon which the

legitimacy of directorial power rests.' " (footnotes omitted, quoting *Centaur Partners,* 582 A.2d at 927)).

**17.** *See* Amended and Restated Bylaws of CNET Networks, Inc., Art. II, § 3 ("Written or printed notice of the annual meeting, stating the place, day and hour thereof, shall be given to each stockholder entitled to vote thereat, in the manner stated in Article VII, Section 1, at such address as appears on the books of the Corporation or to any electronic mail address provided to the Corporation by a stockholder, not less than ten days nor more than sixty days before the date of the meeting.").

**18.** *See id.* ("Any stockholder of the Corporation that has been the beneficial owner of at least $1,000 of securities entitled to vote at an annual meeting for at least one year may seek to transact other corporate business at the annual meeting").

**19.** *See id.* ("provided that such business is set forth in a written notice and mailed by certified mail to the Secretary of the Corporation and received no later than 120 calendar days in advance of the date of the Corporation's proxy statement released to security-holders in connection with the previous year's annual meeting of security holders or, if no annual meeting was held in the previous year or the

notice must also comply with the federal securities laws governing shareholder proposals a corporation must include in its own proxy materials.[20] There are three related reasons I conclude this bylaw can be read only to apply to proposals under Rule 14a–8. First, the notion that a stockholder "may seek to transact other corporate business" does not make sense outside the context of Rule 14a–8. Second, it is reasonable to conclude this bylaw applies only to proposals shareholders want included on management's proxy materials because the bylaw sets the deadline for notice specifically in advance of the release of management's proxy form. Third, and most importantly, the explicit language of the final sentence makes clear that the scope of the bylaw is limited to proposals and nominations a shareholder wishes to have included on management's form of proxy.

A. Shareholders "may seek" to bring proposals under Rule 14a–8; outside that rule, shareholders simply "may bring" such proposals.

 At the heart of the corporate form lies the fundamental principle of separation of ownership and management.[21] Directors must keep generally informed of corporate affairs so as to fulfill their "affir- mative duty to protect [the shareholders'] interests and to proceed with a critical eye in assessing information."[22] Managers, of course, have the far more onerous task of operating the company each day. Shareholders, however, are generally passive and may exercise their rights usually once a year by voting at the corporation's annual meeting.

Yet, even with only this single task, most shareholders are rationally apathetic, the prevailing wisdom explains. Individual investors have too little "skin in the game" to rationally devote the time and energy necessary to keep themselves aware of the details of the corporation's performance or to campaign for corporate change.[23] Furthermore, with ownership diffused among so many holders, there exists a problem of collective action. Although the rise of institutional investment may have significantly narrowed the "gulf between management and ownership ... because there may now be perhaps as few as ten or twelve such holders contributing a decisive voice to a particular issue,"[24] the simple fact remains that most shareholders have better things to do than attend a company's annual meeting. Nevertheless, these shareholders—be they individual or insti-

---

date of the annual meeting has been changed by more than 30 calendar days from the date contemplated at the time of the previous year's proxy statement, a reasonable time before the solicitation is made").

20. See id. ("Notwithstanding the foregoing, such notice must also comply with any applicable federal securities laws establishing the circumstances under which the Corporation is required to include the proposal in its proxy statement or form of proxy.").

21. See 8 Del. C. § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors...."); Aron-

son v. Lewis, 473 A.2d 805, 811 (Del.1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del.2000).

22. Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985).

23. See generally Adolph Berle & Gardiner Means, The Modern Corporation and Private Property (1932); Bernard S. Black, Shareholder Passivity Reexamined, 89 Mich. L.Rev. 520 (1990).

24. James D. Cox, The ALI, Institutionalization, and Disclosure: The Quest for the Outside Director's Spine, 61 Geo Wash. L. Rev. 1233, 1259 (1993).

tutional—may vote via proxy.[25]

As a result, the real action in corporate elections is in the proxy solicitation process,[26] and that process is heavily regulated by both state and federal law.[27] More importantly, the solicitation process is extraordinarily expensive.[28] The traditional proxy contest "involve[s] a fight between management and insurgent shareholders over the control of the corporation in the annual election of directors."[29] Generally, although management is reimbursed for its proxy expenses from the corporate coffers, insurgent shareholders finance their own bid and can hope for reimbursement only if that bid is successful.[30] Such a rule undoubtedly proves intimidating and likely discourages many shareholders from attempting to wage a proxy contest.

To attempt to give shareholders a greater ability to bring proposals without the

cost associated with a fully waged proxy contest, the Securities Exchange Commission in 1942 adopted Rule 14a–8.[31] The current version of Rule 14a–8 describes the circumstances under which management must include a shareholder proposal in its own proxy materials.[32] Permitting a shareholder access to the company's proxy greatly reduces the cost that would otherwise be associated with a proxy fight, but the SEC gave and the SEC hath taken away.[33] Rule 14a–8 may allow a shareholder access to management's proxy, but such access comes at a price. First, to be eligible to even submit a proposal for inclusion, a shareholder must own a certain amount of equity and have been a holder for a year.[34] Second, a shareholder can submit only one proposal per year and the text of the proposal cannot exceed 500

---

**25.** See 8 Del. C. § 212.

**26.** CHARLES R.T. O'KELLEY & ROBERT B. THOMPSON, CORPORATIONS AND OTHER BUSINESS ASSOCIATIONS 208 (5th ed. 2006) ("Both management and those who seek to oppose management on any matter to be voted on at the meeting must themselves solicit proxies from shareholders who will not attend in person. Thus, in most large corporations, the true 'contest' in any disputed matter occurs at the proxy solicitation stage rather than at the actual annual meeting.").

**27.** RANDALL S. THOMAS & CATHERINE T. DIXON, ARANOW & EINHORN ON PROXY CONTESTS FOR CORPORATE CONTROL § 1.01[A] (3d ed. 2001 supp.) ("Regulation of the proxy voting process this became a shared responsibility of the federal and state governments").

**28.** Id. § 21.01; See, e.g., Mark A. Stach, An Overview of Legal and Tactical Considerations in Proxy Contests: The Primary Means of Effecting Fundamental Corporate Change in the 1990s, 13 GEO. MASON L.REV. 745, 776 (1991) (noting that, in a proxy fight for control of Lockheed, "the incumbents spent approximately $8 million and the insurgents spent approximately $6 million").

**29.** HAROLD D. BLOOMENTHAL & SAMUEL WOLFF, SECURITIES AND FEDERAL CORPORATE LAW § 24:39 (2d ed. 2007 supp.).

**30.** See 4 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 1917–26 (3d ed. 2000); Lucian Arye Bebchuk & Marcel Kahan, A Framework for Analyzing Legal Policy Towards Proxy Contests, 78 CAL. L.REV. 1073, 1106 (1990) ("[C]ompanies generally pay all the expenses for the reelection campaign of incumbents, but reimburse challengers only if they gain control over the board of directors.").

**31.** See LOSS & SELIGMAN, supra note 30, at 1992; Patrick J. Ryan, Rule 14a–8, Institutional Proposals, and Corporate Democracy, 23 GA. L.REV. 97, 98 (1988).

**32.** See 17 C.F.R. § 240.14a–8.

**33.** Cf. Job 1:21 (King James) ("the LORD gave, and the LORD hath taken away").

**34.** 17 C.F.R. § 240.14a–8(b). This requirement, added in the 1983 amendments, originally set the ownership floor at $1000. See Ryan, supra note 31, at 115. The Rule has subsequently been revised and the requirement changed to $2000.

words.[35] Third, and most importantly, management may exclude a shareholder proposal for any of thirteen reasons enumerated in the Rule.[36] Thus, although Rule 14a–8 does open the doors to management's proxy materials, management retains significant power as a gatekeeper.[37]

In sum, Rule 14a–8 is a compromise that allows for the presentation of some shareholder proposals without the cost of soliciting proxies, but what a shareholder may do under Rule 14a–8 is far different than what a shareholder may do on his or her own.[38] Notably, the other rules promulgated under the authority of section 14 of the 1934 Exchange Act[39] do not give management the power to stop shareholders from presenting proposals and nominations.[40]

It is in this sense, then, that one understands the use of the phrase "any stockholder of the corporation ... *may seek to transact* other corporate business at the annual meeting."[41] To the extent a shareholder wishes to submit a proposal that will be reported in management's proxy, the shareholder *may seek* inclusion. To the extent a shareholder wishes to put a proposal before his or her fellow shareholders in the form of an independently financed proxy solicitation, however, the federal securities laws do not require the shareholder to seek management's approval.

The language itself is key here, particularly the predicate of the sentence: *may seek to transact ... business.* The busi-

---

35. § 240.14a–8(c)–(d).

36. § 240.14a–8(i); *see also* O'KELLEY & THOMPSON, *supra* note 26, at 214 ("If any of these exceptions applies, then a corporation may refuse to include the submitted proposal in its proxy material."). The reasons management may exclude a proposal are varied, and include a shareholder's attempt to nominate a new director. *See* § 240.14a–8(i)(8) (noting that management may exclude a shareholder proposal "[i]f the proposal relates to a nomination or an election for membership on the company's board of directors or analogous governing body or a procedure for such nomination or election"). Thus, under the rule, management could refuse a shareholder proposal—like JANA's—*that relates* to an election. However, the Rule does not *require* management to exclude such proposals, and to the extent the bylaws provide for such proposals, management may include them.

37. *See* Ryan, *supra* note 31, at 110 ("Viewed in isolation, management's power to exclude proposals under rule 14a–8 appears so extensively drawn as to eliminate any meaningful shareholder proposal.").

38. *See* Elizabeth Cosenza, *The Holy Grail of Corporate Governance Reform: Independence or Democracy?*, 2007 BYU L.REV. 1, 43–44 (2007) (noting available alternatives to Rule 14a–8, specifically that "any shareholder may

conduct an election contest at his or her own expense"); *cf.* Leo E. Strine, *Toward a True Corporate Republic: A Traditionalist Response to Bebchuck's Solution for Improving Corporate America*, 119 HARV. L.REV. 1759, 1773 (2006) ("If investors truly believe that a board is governing poorly and hiding behind its classified status, the traditionalist, in the great spirit of American non-wimpiness, says 'elect your own slate,' who can then change the system.").

39. 15 U.S.C. § 78n (2006).

40. *See* 17 C.F.R. § 240.14a–1 to 240.14b–2.

41. The Court's reference to the federal securities laws in no way contravenes the parol evidence rule, because such reference does not contradict the plain, unambiguous language of the bylaw. The reference to the federal securities laws simply provides the context in which a reasonable, third-party observer would understand the bylaw's language. *See McKinney Family Ltd. P'ship v. Stubbs*, 931 A.2d 1006 (TABLE), 2007 WL 1885121, at *2 n. 9 (Del. July 2, 2007) (" 'The parol evidence rule prevents the consideration of oral evidence that would *contradict* either total or partial integrated agreements.' ") (quoting *Taylor v. Jones*, C.A. No. 1498–K, 2002 WL 31926612, at *3 (Del.Ch. Dec. 17, 2002)).

ness of an annual meeting is the election and voting process.[42] Thus, the bylaw says that a qualified shareholder may seek to transact an election—in other words, *may seek* to put an issue or nominations up for an election. The phrase "may seek" suggests that the shareholder must ask for permission or approval to make such a proposal.[43] A shareholder essentially requests the inclusion of a proposal in management's proxy materials under Rule 14a–8; outside that rule, however, a shareholder simply makes a proposal. Thus, the "may seek to transact" language of the bylaw envisions use of Rule 14a–8. Because JANA intends to finance its own proxy solicitation, such language indicates that the bylaw does not apply to JANA's proposals.[44]

> B. *The bylaw establishes a deadline that would permit the corporation to include approved proposals in its form of proxy.*

The second indication that the Notice Bylaw does not apply to JANA's indepen- dently funded proxy solicitation is that the bylaw establishes its deadline for notice by reference to the date on which the CNET will mail its own proxy materials. Specifically, a shareholder seeking to make a proposal under the bylaw is required to inform the CNET corporate secretary via written notice "received no later than 120 calendar days in advance of the state of the Corporation's proxy statement" or, if there was no annual meeting the previous year or if this year's meeting date has changed significantly from the previous year, "a reasonable time before the solicitation is made."

In other words, this bylaw requires a shareholder bringing a proposal to give advance notice, but ties the deadline for that notice explicitly to the release of CNET's proxy materials. The most reasonable explanation for so requiring is that the bylaw is designed to allow management time to include the shareholder proposal in it own proxy materials. A similar requirement is established by Rule 14a–8 itself.[45]

**42.** *See* 8 *Del. C.* § 211(b) ("Unless directors are elected by written consent in lieu of an annual meeting as permitted by this subsection, *an annual meeting of stockholders shall be held for the election of directors*" (emphasis added)); *Coaxial Commc'ns, Inc. v. CNA Financial Corp.*, 367 A.2d 994, 998 (Del.1976) ("The mandate of 8 *Del. C.* § 211(b) is that an annual meeting of stockholders 'shall be held for the election of directors' "); *Clabault v. Caribbean Select, Inc.*, 805 A.2d 913, 917 (Del. Ch.2002) ("The case law interpreting Section 211(c) strongly favors the convening of an annual meeting for the purpose of electing directors when the factual predicate defined by the statute is shown"), *aff'd*, 846 A.2d 237 (Del.2003).

**43.** WEBSTER'S II NEW COLLEGE DICTIONARY 999 (2d ed. 1995) (defining "seek" as "To ask for: REQUEST").

**44.** *Cf. Bernstein v. Tractmanager, Inc.*, C.A. No. 2763–VCL, 2007 WL 4179088, at *4 (Del. Ch. Nov. 20, 2007) (referring to statutes and policy behind statutes while interpreting unambiguous bylaw provisions); *Frankino v. Gleason*, C.A. No. 17399, 1999 WL 1032773, at *4 (Del.Ch. Nov. 5, 1999) (considering "Delaware's 'general policy against disenfranchisement' " when construing a company's bylaws).

**45.** *See* 17 C.F.R. § 240.14a–8(e)(2) ("The proposal must be received at the company's principal executive offices not less than 120 calendar days before the date of the company's proxy statement released to shareholders in connection with the previous year's annual meeting. However, if the company did not hold an annual meeting the previous year, or if the date of this year's annual meeting has been changed by more than 30 days from the date of the previous year's meeting, then the deadline is a reasonable time before the company begins to print and send its proxy materials").

CNET's contention that this bylaw merely acts as an advance notice bylaw is undercut by this Court's previous encounters with advance notice bylaws. An advance notice bylaw is one that requires stockholders wishing to make nominations or proposals at a corporation's annual meeting to give notice of their intention in advance of so doing.[46] This Court has upheld such bylaws in the past,[47] but has warned that "when advance notice bylaws unduly restrict the stockholder franchise or are applied inequitably, they will be struck down."[48] This Court cannot find a single example of a permissible advance notice bylaw that has set the notice required by reference to the release of the company's proxy statement.[49] Although not dispositive, this suggests that the CNET Notice Bylaw is designed to govern shareholder proposals under Rule 14a–8 rather than to operate as an advance notice bylaw. CNET is correct that it has no other advance notice provision and that if the Notice Bylaw is interpreted to apply only to 14a–8 proposals, then "any of

CNET's thousands of stockholders are free to raise for the first time and present any proposals they desire at the Annual Meeting."[50] Although this may sound daunting, it is the default rule in Delaware.[51]

### C. The reference to Rule 14a–8 in the final sentence of the bylaw defines its scope.

Most persuasively, the final sentence of the Notice Bylaw establishes that the bylaw applies only to proposals that shareholders seek to have included on the company's proxy materials. That sentence provides, "Notwithstanding the foregoing, such notice must also comply with any applicable federal securities laws establishing the circumstances under which the Corporation is required to include the proposal in its proxy statement or form of proxy." The "applicable federal securities laws" that establish "the circumstances under which the Corporation is required to include" shareholder proposals in its proxy

**46.** *See, e.g., Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228, 238–39 (Del.Ch.2007) (defining advance notice bylaws as "provisions that require stockholders to provide the corporation with prior notice of their intent to nominate directors along with information about their nominees"); *Accipiter Life Sciences Fund, L.P. v. Helfer*, 905 A.2d 115, 125 (Del.Ch.2006).

**47.** *See, e.g., Stroud v. Grace*, 606 A.2d 75, 95 (Del.1992).

**48.** *Openwave*, 924 A.2d at 239.

**49.** *See Openwave*, 924 A.2d 228 (upholding bylaws that require advance notice be given "not less than 20 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting"); *Accipiter*, 905 A.2d 115 (upholding bylaws that require notice be given within ten days from the public announcement of the annual meeting date); *Harbinger Capital Partners Master Fund I, Ltd. v. Nw. Corp.*, C.A. No. 1937–N, 2006 WL

572823 (Del.Ch. Feb. 23, 2006) (denying motion to expedite in case challenging advance notice bylaw that required plaintiff "to identify its slate of proposed board candidates three months in advance of the meeting"); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 42 (Del.Ch.1998) (discussing, but not ruling on the validity of, an advance notice bylaw requiring notice be given 90–100 days before a meeting), *aff'd sub nomine Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del.1998); *see also In re Unitrin, Inc. S'holders Litig.*, C.A. No. 13656, 1994 WL 698483 (Del.Ch. Oct. 13, 1994) (implicitly upholding an advance notice bylaw requiring notice be given 60 days in advance of meeting), *rev'd on other grounds sub nomine Unitrin, Inc. v. Am. Gen'l Corp.*, 651 A.2d 1361 (Del.1995).

**50.** Def.'s Answering Br. at 17.

**51.** *See* 8 *Del. C.* § 222(a) (requiring advance notice of business in special meetings but not in annual meetings).

materials clearly refer to Rule 14a–8.[52] Such reference reminds shareholders seeking to make proposals under the bylaw that Rule 14a–8 sets requirements in addition to those laid out in the bylaw itself.[53]

The specific language used in the final sentence of the bylaw mandates my conclusion that the bylaw only applies to Rule 14a–8 proposals. By using the phrase "such notice," the sentence refers back to the notice described in the preceding sentence that a shareholder must give (i.e., the notice given to the CNET corporate secretary in advance of the release of the corporation's proxy materials). The sentence goes on to say that, despite any earlier indication to the contrary,[54] such notice must comply fully with Rule 14a–8. The bylaw incorporates all of the requirements of Rule 14a–8, a rule promulgated by the SEC to give certain—but not all—shareholders limited access to the corporate proxy materials.[55] There is no reason for CNET to have grafted Rule 14a–8's burdensome requirements onto its Notice Bylaw if that bylaw applied outside the context of 14a–8 proposals.

The "rule of construction in favor of franchise rights"[56] buttresses this conclusion. Delaware courts have long recognized that the "right of shareholders to participate in the voting process includes the right to nominate an opposing slate."[57] As I have concluded above, the Notice Bylaw clearly purports to incorporate all of Rule 14a–8's requirements. Those substantial requirements find themselves part of Rule 14a–8 because that rule is a compromise: shareholders have access to management's proxy materials, but only if they meet the rule's significant procedural prerequisites.[58] The SEC was justified in imposing such taxing requirements because corporate proxy machinery needed to be protected from abuse by self-serving shareholders.[59] The rule's requirements do not burden those shareholders who seek to fund their own proxy solicitation.[60] Because Rule 14a–8 imposes restrictions and requirements on the nomination process, and because the "rule of construction in favor of franchise rights" instructs me to interpret bylaw provisions "in the man-

---

52. *See* JAMES D. COX, ROBERT W. HILLMAN, & DONALD C. LANGEVOORT, SECURITIES REGULATION CASES AND MATERIALS 939–42 (5th ed. 2006); LOSS & SELIGMAN, *supra* note 30, at 1992.

53. *See, e.g.,* 17 C.F.R. § 240.14a–8(d) (noting that shareholder proposals may not exceed 500 words).

54. The sentence begins, "Notwithstanding the foregoing."

55. Melvin Aron Eisenberg, *Access to the Corporate Proxy Machinery,* 83 HARV. L.REV. 1489, 1502 (1970) ("[R]ule 14a–8 proves explicitly that certain types of shareholder proposals must be included in the corporation's proxy materials if they are made by a holder of voting securities subject to the Proxy Rules. However, the access so provided is severely restricted in a variety of ways.").

56. *Harrah's Entm't, Inc. v. JCC Holding Co.,* 802 A.2d 294, 310 (Del.Ch.2002).

57. *Linton v. Everett,* C.A. No. 15219, 1997 WL 441189, at *9 (Del.Ch. July 31, 1997); *see also Hubbard v. Hollywood Park Realty Enters., Inc.,* C.A. No. 11779, 1991 WL 3151, at *5 (Del.Ch. Jan. 14, 1991).

58. *See* part IV.A of this decision.

59. *See* Eisenberg, *supra* note 55, at 1493–94 ("[T]he corporate proxy machinery is just that—*corporate* proxy machinery, constructed of corporate assets, and fueled with corporate funds. Thus, it cannot be appropriated to personal ends. . . .").

60. *See* LOSS & SELIGMAN, *supra* note 30, at 1993 n. 186 ("Any shareholder proponent who is willing to bear the expense of proceeding under Rule 14a–7 is not subject to the full panoply of Rule 14a–8 procedural requirements.").

ner most favorable to the free exercise of traditional electoral rights,"[61] I conclude that CNET's Notice Bylaw does not apply to shareholder proposals and nominations brought outside rule 14a–8.[62]

## V. CONCLUSION

CNET's Notice Bylaw unambiguously applies only to proposals and nominations a shareholder wishes to have included in the corporate proxy materials. The language of the provision—construed as required by law—mandates this conclusion. First, the bylaw notes that a shareholder "may seek" to have an issue brought to a vote. The precatory nature of the bylaw recalls the inherently precatory nature of Rule 14a–8. Second, a shareholder who seeks to make a proposal under the bylaw must submit notice to the company in time to have the company include the proposal on its own form of proxy. This timing requirement only makes sense in the context of Rule 14a–8 and does not mirror any of the generally applicable advance notice bylaws that this Court has previously found valid. Finally, the last sentence of the bylaw purportedly grafts onto the bylaw all of the requirements of Rule 14a–8. Those requirements far exceed the default rules under Delaware law and were designed by the SEC only to apply in the context of Rule 14a–8. Under this Court's rules of construction favoring the free exercise of shareholders' electoral rights, I must read that final sentence to set the

scope of the bylaw narrowly and, therefore, conclude that the bylaw does not apply outside the context of Rule 14a–8.

Because JANA does not request CNET to include its proposals or nominations in the corporate proxy materials, JANA need not comply with the Notice Bylaw's requirements. Because I have concluded that the bylaw does not apply to JANA in this circumstance, I will not consider its hypothetical validity were it to apply as CNET contended.

The parties shall submit a form of order implementing this decision within seven days from this date.

---

**61.** *Harrah's Entm't*, 802 A.2d at 312.

**62.** CNET notes that it has interpreted the Notice Bylaw to be applicable to *all* shareholder proposals and has disclosed its interpretation in pre-litigation documents like the company's proxy statement for the 2007 annual meeting. CNET argues that this expressed, pre-litigation position should be viewed as evidence of the meaning of the parties' mutual understanding of the provision. However, the bylaw in question was

not a bilaterally negotiated contract between CNET and its public shareholders (it was adopted before CNET's IPO) and, therefore, CNET's authority regarding the use of pre-litigation conduct as evidence is inapposite. *See SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del.1998) ("[U]nless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language.").