# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SABA CAPITAL MASTER FUND,
LTD.,

    Plaintiff,

    v.

BLACKROCK CREDIT
ALLOCATION INCOME TRUST,
BLACKROCK NEW YORK
MUNICIPAL BOND TRUST,
BLACKROCK ADVISORS, LLC,
RICHARD E. CAVANAGH, KAREN
P. ROBARDS, MICHAEL J.
CASTELLANO, CYNTHIA L. EGAN,
FRANK J. FABOZZI, HENRY
GABBAY, R. GLENN HUBBARD,
W. CARL KESTER, CATHERINE A.
LYNCH, ROBERT FAIRBAIRN, and
JOHN M. PERLOWSKI,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0416-MTZ

## MEMORANDUM OPINION

Date Submitted: June 25, 2019
Date Decided: June 27, 2019

Carmella P. Keener, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Carol S. Shahmoon and Gregory E. Keller, SHAHMOON KELLER PLLC, Great Neck, New York; *Attorneys for Saba Capital Master Fund, Ltd.*

William M. Lafferty, D. McKinley Measley, Thomas P. Will, and Lauren P. Russell, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Alexander L. Cheney, and Brittany M. Wagonheim, WILKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for BlackRock Credit Allocation Income Trust and BlackRock New York Municipal Bond Trust.*

Robert S. Saunders and Ronald N. Brown, III, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Wilmington, Delaware; Eben P. Colby, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Boston, Massachusetts; *Attorneys for BlackRock Advisors, LLC, Robert Fairbairn, and John M. Perlowski.*

Gregory P. Williams and Kevin M. Regan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John S. Kiernan and Jeremy Feigelson, DEBEVOISE & PLIMPTON LLP, New York, New York; *Attorneys for Richard E. Cavanagh, Karen P. Robards, Michael J. Castellano, Cynthia L. Egan, Frank J. Fabozzi, Henry Gabbay, R. Glenn Hubbard, W. Carl Kester, and Catherine A. Lynch.*

**ZURN, Vice Chancellor.**

A shareholder of two closed-end investment funds seeks to challenge the re-election of incumbent board members at the upcoming annual meetings. In line with the funds' advance notice bylaw provisions, the shareholder provided timely warning of its dissident slate of nominees. The funds, as permitted by their bylaws, then requested that the shareholder supplement those notices with additional information. The requested supplement was a questionnaire comprising nearly one hundred questions over forty-seven pages, and was due in five business days. When the shareholder missed that deadline, the funds declared that the nominations were invalid and would not be counted at the elections, then trumpeted that announcement in their proxies. Because the annual meetings are swiftly approaching, the shareholder sued and sought preliminary injunctive relief on two claims: a breach of the bylaws, and a breach of the defendants' fiduciary duties.

On this highly expedited and pre-discovery record, I deny the shareholder injunctive relief on its claims that the defendants breached their fiduciary duties. Proof of those claims sufficient to grant the shareholder's chosen relief requires more than the inferences offered to date. But the breach of bylaws claim does not hinge on any disputed facts and is resolvable even on this truncated record. I find that the defendants' questionnaire exceeded the inquiry that their bylaws permit, and as a result, the defendants cannot invalidate the shareholder's nominations on the

grounds that the overbroad questionnaire was not timely returned. Votes in favor of the dissident slate shall be counted at the annual meetings.

## I.    BACKGROUND

I draw the undisputed facts from the Amended Complaint, and address only those facts necessary to resolve the expedited claims. Defendant BlackRock Credit Allocation Income Trust ("BTZ") and BlackRock New York Municipal Bond Trust ("BQH," or, with BTZ, the "Trusts") are Delaware statutory trusts registered as closed-end investment companies under the federal Investment Company Act of 1940. Defendant BlackRock Advisors, LLC ("Advisor") advises the Trusts. Non-party BlackRock Inc. created and manages the Trusts, and is the parent of Advisor. The individual defendants are all members of the Boards of Trustees that oversee the Trusts (the "Boards"). Plaintiff Saba Capital Master Fund, Ltd., ("Saba") is a Cayman Islands company and shareholder of the Trusts.[1]

Each Trust is governed by declarations of trust and a set of bylaws. BQH's bylaws are dated October 28, 2010, and BTZ's bylaws are dated October 28, 2016 (together, the "Bylaws").[2] The two Bylaws have an identical Article I, Section 7 ("Section 7"), that lays out how shareholders can nominate trustees to a Board.

---

[1] I refer to the briefing as the "Opening Brief," the Trusts' "Answering Brief," and the "Reply Brief." Docket Item ("D.I.") 13, 25, 32. The other Defendants' briefing incorporates and largely relies on the Answering Brief. D.I. 24, 26.

[2] D.I. 25, Transmittal Aff. of Thomas P. Will [hereinafter the "Will Affidavit"] Ex. C; Will Aff. Ex. D.

2

Sections 7(b) and (c) are advance notice bylaws requiring shareholders to give timely written notice of a nomination (a "Nomination Notice"). Section 7(d) enumerates the required contents for a proper Nomination Notice. For instance, under Section 7(d)(i)(C)(6), the Nomination Notice must include "information to establish to the satisfaction of the Board of Directors that the Proposed Nominee satisfies the director qualifications as set out in Section 1 of Article II." Article II, Section 1 ("Section 1"), also identical for both Bylaws, provides an expansive list of qualifications that prospective trustees must meet to serve on either of the Boards. The parties agree that some of those qualifications relate to parallel requirements under the Investment Company Act of 1940.

This dispute turns most on Section 7(e), which permits the Board to request updates and supplements to a Nomination Notice as follows:

> A shareholder of record, or group of shareholders of record, providing notice of any nomination . . . shall further update and supplement such notice, ***if necessary***, so that:

> (i) the information provided or required to be provided in such notice pursuant to this Section 7 of this Article I shall be true and correct as of the record date for determining the shareholders entitled to receive notice of the annual meeting or special meeting in lieu of an annual meeting, and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Fund not later than five (5) business days after the record date for determining the shareholders entitled to receive notice of such annual meeting or special meeting in lieu of an annual meeting; and

(ii) *any subsequent information reasonably requested by the Board of Directors to determine that the Proposed Nominee has met the director qualifications as set out in Section 1 of Article II is provided*, and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Fund *no later than five (5) business days after the request by the Board of Directors for subsequent information* regarding director qualifications has been delivered to or mailed and received by such shareholder of record, or group of shareholders of record providing notice of any nomination.[3]

On or about March 30, 2019, Saba delivered a Nomination Notice to the Trusts nominating four individuals for election to each of the Boards (the "Nomination Letters").[4] Saba timely delivered the Nomination Letters under Section 7, and addressed each of Section 1's requirements, albeit at a high level and without much context or explanation.

On April 22, BTZ's counsel emailed Saba "[p]ursuant to [Section 7]" and "on behalf of [BTZ's Board] to request additional information with respect to the nominees."[5] The email asked that "each of the proposed nominees complete and sign the attached questionnaire[.]"[6] The first thirty-one pages of the questionnaire (the "Questionnaire") appear to be a document that sitting Board trustees complete

---

[3] Bylaws Art. I, § 7(e) (emphases added).

[4] D.I. 23 ¶¶ 40-41 [hereinafter the "Amended Complaint"]; *see* D.I. 14, Transmittal Aff. of Michael D'Angelo [hereinafter the "D'Angelo Affidavit"] Ex. 1.

[5] D'Angelo Aff. Ex. 2.

[6] *Id.*

to provide the Trusts with periodic information needed to "prepare regulatory filings, . . . determine whether a Director or nominee may be an 'interested person' [under the Investment Company Act of 1940], . . . evaluate potential conflicts of interest, . . . update records, . . . [and] comply with other applicable laws and regulations."[7] The last sixteen pages of the Questionnaire comprise an annex for nominees to complete if they intend "to serve as a Director at this year's Annual Meeting of Shareholders," along with various schedules and definitions to complete the Questionnaire.[8] Depending on sub-parts, Saba counts ninety-five questions on the Questionnaire, while Defendants count ninety-seven.

At argument, Saba's counsel represented that Saba and the nominees began completing the Questionnaire on or about April 22, but that Saba did not view the Questionnaire as falling under the five business day deadline imposed by Section 7(e)(ii). Whatever the reason, Saba did not submit the completed Questionnaire for any nominee within that deadline. On May 1, BTZ's Board emailed Saba to announce that "the [Nomination Notice] is invalid under [BTZ's] bylaws and Delaware law."[9] Saba responded that day by letter contesting the Board's

---

[7] *Id.*

[8] *Id.*

[9] D'Angelo Aff. Ex. 3.

5

determination and attaching the nominees' completed Questionnaires.[10]  On May 7, the Trusts responded to underscore their determination that Saba's failure to complete the Questionnaire under the deadline in Section 7(e)(ii) rendered the Nomination Notices invalid under either Trust's Bylaws.[11]  The Trusts also provided their "initial review of [the] questionnaires . . . [a]s a courtesy."  Saba sent a letter response that day, and another on May 9.[12]

What followed was the flurry of SEC filings and fight letters that accompany a challenge to an incumbent board.  To provide a few examples, BQH filed its preliminary proxy statement on May 10, which indicated that "[t]he Board has determined the nominations of the [Saba nominees] to be invalid as a result of Saba's hedge fund failing to comply with the Trust's By-laws."[13]  On May 20, BTZ filed its preliminary proxy statement, likewise declaring that "[t]he Board has determined the nominations of the [Saba nominees] to be invalid as a result of Saba's hedge fund failing to comply with the Trust's By-laws.  As a result, any votes with respect to the [Saba nominees] will not be counted at the meeting."[14]  On May 24, BQH filed

---

[10] D'Angelo Aff. Ex. 4.

[11] D'Angelo Aff. Ex. 5.

[12] D'Angelo Aff. Ex. 6; Am. Compl. ¶ 55.

[13] Will Aff. Ex. P at 2.

[14] Will Aff. Ex. B at 2.

its definitive proxy statement, which set its annual meeting date for July 18 and instructed shareholders to "[p]lease discard any proxy card from Saba as any votes with respect to [its nominees] will not be counted at the meeting."[15] BQH emphasized the same in fight letters to its shareholders.[16] Saba's proxy materials also acknowledged the dispute.[17]

Saba filed this action on June 4. It asserts four counts, but seeks preliminary relief only for Counts III and IV. Count III alleges that Defendants violated the Bylaws by purporting to render the Nomination Notices invalid under Section 7(e)(ii) for failure to timely return the Questionnaires. Count IV alleges that the Defendants breached their fiduciary duties under the same nucleus of facts.[18] The parties agreed to expedite briefing on preliminary relief. The day after Saba filed its complaint, on June 5, BTZ filed its definitive proxy statement and set its meeting date for July 8, three weeks before last year's meeting date of July 30, according to Saba.[19] On June 12, Saba amended its complaint to, among other things, include

---

[15] Will Aff. Ex. S at 17.

[16] Will Aff. Ex. T.

[17] Will Aff. Exs. R, U.

[18] Saba assets Count IV against the "Defendants" generally, but does not explain whether it believes any of the entity Defendants to owe fiduciary duties. The distinction does not matter for this opinion.

[19] Am. Compl. ¶ 59.

7

allegations relating to BTZ's definitive proxy. Saba requested that the Court rule by June 28 in order to minimize the chance that brokers would discretionarily vote the shares of clients who did not provide voting instructions under New York Stock Exchange rules.[20] As a result, I heard argument on June 25.

The Amended Complaint advances several requests for injunctive relief. But Saba narrowed those requests to two. It asks this Court to enter preliminary relief "to allow the nominations to be presented and votes to be counted."[21]

## II. ANALYSIS

"To obtain a preliminary injunction, [Saba] must demonstrate: (1) a reasonable probability of success on the merits; (2) that [it] will suffer irreparable injury without an injunction; and (3) that [its] harm without an injunction outweighs the harm to the defendants that will result from the injunction."[22] "This Court has utilized the higher mandatory injunction standard where, instead of seeking to preserve the status quo as interim relief, Petitioners, as a practical matter, seek the very relief that they would hope to receive in a final decision on the merits."[23]

---

[20] D.I. 2.

[21] Reply Br. 1; *see also* Opening Br. 1.

[22] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' Ret. Tr.*, 107 A.3d 1049, 1066 (Del. 2014).

[23] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004) (quotations omitted).

8

Saba asks this Court to allow its nominees to be freely presented and votes counted in the election. The parties dispute whether Saba seeks preliminary or mandatory relief. I find that granting Saba's requests would permit it "to run its dissident slate of directors and thereby receive virtually all the relief it seeks" in Counts III and IV, which seek to prevent the Defendants from applying Section 7(e)(ii) to invalidate the Nomination Notices.[24] Under the status quo, Defendants have asserted their Bylaws and concluded that Saba's nominees are ineligible for election. The relief Saba seeks would upend, not preserve, that status quo, by requiring Defendants to permit and count votes they otherwise would not have. "Thus, [Saba] effectively seeks a mandatory injunction"[25] and, at this expedited and pre-discovery stage, must make a showing "sufficient to support a grant of summary judgment."[26]

---

[24] *AB Value Partners, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014).

[25] *Id.* at *3; *see also Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *13 n.14 (Del. Ch. Jan. 14, 1991) (finding mandatory relief standard applied when issuing "a preliminary injunction. . . directing the cross-defendants to waive the advance notice by-law requirement so as to afford any shareholder who so desires a reasonable opportunity to nominate a dissident slate of candidates for election to the [] board").

[26] *Opportunity Partners L.P. v. Hill Int'l, Inc.*, 2015 WL 3582350, at *3 (Del. Ch. June 5, 2015), *aff'd sub nom. Hill Int'l, Inc. v. Opportunity Partners L.P.*, 119 A.3d 30 (Del. 2015); *see also Munford v. Newark Hous. Auth.*, 2000 WL 546078, at *1 (Del. Ch. Apr. 26, 2000) ("Because mandatory preliminary injunctive relief is requested, the application will be governed by the standard applicable to a request for summary judgment.").

### A. Saba Has Made A Sufficient Showing On The Merits Under Count III, But Not Count IV.

I address the merits prong for injunctive relief first. Count III is essentially a breach of contract claim with undisputed facts, based on an unambiguous provision of the Bylaws. I conclude Saba meets the standard for mandatory relief even at this early stage. But mandatory relief under Count IV, which depends on complex and disputed facts, including Defendants' intent in issuing the Questionnaire, is not supported at this time.

#### 1. Count III

The Bylaws "constitute part of a binding broader contract among the directors, officers and stockholders."[27] Count III asserts a breach of the Bylaws and claims that (1) the Questionnaire could not have been submitted as a Section 7(e)(ii) request on April 22,[28] (2) even if it could, the Questionnaire was not clearly posed to Saba as a Section 7(e)(ii) request,[29] and (3) even if it was, the Questionnaire exceeded the scope Section 7(e)(ii) permits.[30] These questions turn on a disputed interpretation of Section 7. "Words and phrases used in a bylaw are to be given their commonly accepted meaning unless the context clearly requires a different one or unless legal

---

[27] *Hill Int'l, Inc.*, 119 A.3d at 38.

[28] *See generally* Opening Br. 25-30.

[29] *See generally id.* at 11, 16, 23.

[30] *See generally id.* at 31-33.

phrases having a special meaning are used."[31]  "If charter or bylaw provisions are unclear, we resolve any doubt in favor of the stockholder's electoral rights."[32]

Both parties argue that the relevant Bylaws unambiguously support their interpretation.  Although Saba's position appeared to evolve somewhat from briefing to argument, it broadly asserts that a request under Section 7(e)(ii) may only be made subsequent to one or more of the following:  an identified change to the contents of a Nomination Notice that requires an update or supplement, an update pursuant to Section 7(e)(i), or an information request under Section 7(d)(i)(C)(6).[33]  Defendants assert that Section 7(e)(ii) is the exclusive method for the Boards to request supplemental information relating to Nomination Notices in the Bylaws, and that such a request need not be preceded by any of the triggering events Saba identifies.

Although I must construe ambiguity in Saba's favor,[34] I agree with Defendants' interpretation and find Section 7(e)(ii) unambiguous in this context. Section 7(e)(ii) provides the sole method identified by the parties for the Boards to request supplemental information to a Nomination Notice.  Section 7(d)(i)(C)(6)

---

[31] *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del. 1983).

[32] *Hill Int'l, Inc.*, 119 A.3d at 38.

[33] Bylaws Art. I, § 7(d)(i)(C)(6) (requiring a Nomination Notice to include "information to establish to the satisfaction of the Board of Directors that the Proposed Nominee satisfies the director qualifications as set out in Section 1 of Article II").

[34] *See Hill Int'l, Inc.*, 119 A.3d at 38.

11

indicates that a Nomination Notice must satisfy the Board that the nominee meets Section 1's requirements, but, contrary to Saba's argument, does not include an independent right under that section for the Board to request information. Further, a request under Section 7(e)(ii) does not need to follow the record date or any other triggering event related to Section 7(e)(i).[35] Under this plain reading of the Bylaws, the Boards could request supplemental information related to the Nomination Letters on April 22 under Section 7(e)(ii).

Saba's next argument is that the April 22 email transmitting the Questionnaire did not effectively communicate that it was a request under Section 7(e)(ii), and so Defendants should not be permitted to impose that Section's five-day deadline. It is unclear whether this argument rings in estoppel or some other principle, but I reject it regardless of form. While I agree that the April 22 email was less than transparent when it referred only to a request for "additional information" under "Article I, Section 7," Saba, a sophisticated entity that had already completed the Nomination Letters and understood the structure of the Bylaws, could only have been reasonably confused by the April 22 email if there was another method under Section 7 for the

---

[35] Saba relies, among other things, on the consecutive "and" between Sections 7(e)(i) and (ii). But that indicates only that the two subsections are not mutually exclusive, not that they must occur jointly. Any other reading would lead to bizarre results. For instance, the Board would have no right to request supplemental information (under Section 7(e)(ii)) in situations where a shareholder did not, or was not required to, update its Nomination Notice to reflect changes as of the record date (under Section 7(e)(i)).

12

Boards to request additional information about the nominations. As addressed above, Section 7(e)(ii) is the only provision applicable to that purpose.

Saba's final argument is that the Questionnaire exceeded the bounds and form Section 7(e)(ii) permits, and thus Saba cannot reasonably be held to the response deadline. Section 7(e)(ii) requires shareholders to "update and supplement" their Nomination Notices, "if necessary," in response to a request from the relevant Board for "any subsequent information reasonably requested . . . to determine that the Proposed Nominee has met the director qualifications as set out in Section 1 of Article II." Thus, the Bylaws imposed three restrictions on the Boards' right to request updates and supplements to the Nomination Letters: the desired information must be (a) for the purpose of determining whether Saba's nominees met Section 1's enumerated requirements, (b) "reasonably requested" with that scope in mind, and (c) "necessary" for the Boards' determinations.

On my request, Saba and Defendants submitted demonstratives categorizing whether each of the subpart questions in the Questionnaire related to Section 1's director qualifications or some other purpose.[36] The parties diverge on how many questions in the Questionnaire sought information relevant to the trustee requirements in Section 1: Defendants claim about two thirds, and Saba claims only

---

[36] D.I. 35.

13

about one third. But even taking Defendants' demonstrative as accurate, the Questionnaire included thirty questions (out of about one hundred) that were not tied to Section 1. These included questions, and justifications for asking the questions, like:

- "The Iran Threat Reduction and Syria Human Rights Act of 2012 ('ITR Act') requires, among other things, that each Fund disclose in its annual and periodic reports information regarding whether any of its 'affiliates' knowingly have engaged in certain activities that are sanctionable pursuant to the Iran Sanctions Act of 1996 (the '1996 Act') or the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010 (the '2010 Act'). The term 'knowingly' means that a person has actual knowledge or should have known of the conduct, the circumstance or the result, as the case may be. During the last two calendar years, have you knowingly engaged in any of the following: An activity that meets the criteria for sanctions under the 1996 Act. Such activities may include the following: Transactions relating to Iran's petroleum or petrochemical industries . . . [or] Transactions facilitating Iran's procurement or proliferation of conventional weapons or weapons of mass destruction[;] An activity that meets the criteria for sanctions under the 2010 Act, dealing with the transfer of certain goods (such as firearms) or technologies to Iran that are likely to be used by Iranian authorities to commit human rights abuses[;] A transaction or dealing with any person whose assets are frozen by the U.S. Government under legal authorities dealing with terrorism or the proliferation of weapons of mass destruction. These persons appear on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control ('OFAC'), and include many large Iranian companies[;] A transaction or dealing with the Government of Iran, including any entity identified by OFAC as being part of the Government of Iran, without authorization from the U.S. Government."[37] Defendants claim the purpose for this question was compliance with the ITR Act.

---

[37] D'Angelo Aff. Ex. 2 at 31.

14

- "Have you ever been disqualified, suspended, dismissed, placed on academic probation or otherwise subject to a disciplinary action at any academic institution."[38] Defendants claim the purpose for this question was to determine whether the nominees were suitable to serve as trustees.

- "Have you ever been the subject of any allegation involving sexual assault, sexual harassment or sexual misconduct, irrespective of whether such allegation ultimately resulted in any formal or informal claims or litigation."[39] Defendants claim the purpose for this question was to determine whether the nominees were suitable to serve as trustees.

- "Describe your current business and other commitments, and your expected business and other commitments over the next three years. Please attached a comprehensive resume or curriculum vitae covering at least the last 5 years."[40] Defendants claim the purpose for this question was to determine whether the nominees were suitable to serve as trustees.

- "Are you currently, or have you ever been, nominated by a shareholder to serve on a public company or fund board," and, "[i]f yes, tell us who nominated you and, if applicable, the result of the election. In any of those cases, did you withdraw your nomination or was your nomination withdrawn? If your nomination was ever withdrawn, please describe the reasons for the withdrawal."[41] Defendants claim the purpose for this question was to determine whether the nominees were suitable to serve as trustees.

The Boards were entitled to ask for supplemental information and updates under Section 7(e)(ii) to determine that the nominees "met the director qualifications as set out in Section 1 of Article II."[42] And certainly some amount of the

---

[38] *Id.* at 38.

[39] *Id.*

[40] *Id.* at 39.

[41] *Id.* at 40.

[42] Bylaws Art. I, § 7(e)(ii).

15

Questionnaire fell within the square boundaries of that authority. But Defendants went too far. By including in the Questionnaire a substantial number of questions unrelated to Section 1's director qualifications, and nonetheless enforcing the strict five-day deadline to invalidate Saba's nominations, Defendants overstepped their authority under Section 7(e)(ii) while demanding strict compliance from Saba. Defendants assert that the Questionnaire was broad because it is also designed to ensure that nominees satisfy federal regulations and requirements, as well as to elicit information the Boards would simply like to know about nominees.[43] While those goals are understandable, the plain meaning of Section 7(e)(ii) only permits inquiries into director qualifications as confined by Section 1. Defendants provide no reason why these additional and purportedly critical issues had to be dropped on Saba with a five-day deadline, when they could have been solicited through the already expansive Nomination Notice requirements and Section 1. Including questions unrelated to Section 1's trustee qualifications made the Questionnaire, or even a targeted and appropriate subset of that Questionnaire, more burdensome to answer within the five-day deadline.

Accordingly, I find that the Questionnaire as a whole was not "reasonably requested" or "necessary" to determine whether Saba's nominees met Section 1's

---

[43] *See* Answering Br. 14.

16

requirements. Having issued a request that exceeded the Bylaws' scope, Defendants are not permitted to rely on the five-day deadline for Saba's compliance with that request.[44] Because Saba submitted the Questionnaire, albeit shortly after the deadline, the Court need not decide whether Saba's nominations were invalid for failure to timely respond to the proper portions of the Questionnaire, or precisely what portions of the Questionnaire were proper under Section 7(e)(ii).

### 2. Count IV

"Advance notice bylaws are often construed and frequently upheld as valid by Delaware courts."[45] But this Court "has warned that 'when advance notice bylaws unduly restrict the stockholder franchise or are applied inequitably, they will be struck down.'"[46] Because I find that Saba has satisfied its burden on Count III, "the court need not reach any of the arguments about whether the defendants have acted

---

[44] The parties dispute whether the Boards had the authority to declare the Nomination Notices invalid at all, or whether the Bylaws vested the discretion solely with the chairperson of each Trust's annual meeting under Section 7(f). I do not reach that question because I grant Saba's relief to count votes received for its nominees.

[45] *Openwave Sys. Inc. v. Harbinger Capital Partners Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007) ("Such bylaws are designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations.").

[46] *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 344 (Del. Ch. 2008) (finding against the company's interpretation of its advance notice bylaw) (quoting *Openwave Sys. Inc.*, 924 A.2d at 239); *see also Hill Int'l, Inc.*, 119 A.3d at 38-41 (affirming a mandatory injunction where the company wielded an incorrect interpretation of its bylaws to purportedly invalidate a shareholder's nomination to the board).

inequitably."[47] Nonetheless, I briefly address Count IV to note that I would deny Saba relief under the mandatory injunction standard at this stage. Count IV asserts that Defendants violated their fiduciary duties because their "primary purpose in applying the Bylaws to preclude [Saba's] nominations for failure to deliver responses to the [] Questionnaire within five business days is to interfere with the ability of shareholders to nominate and vote for trustees other than the incumbents," "Defendants have no reasonable or compelling justification for such interference with the shareholder franchise," and "Defendants' actions violate their fiduciary duties under Delaware law to ensure fair and reasonable nominating and voting procedures in the election of directors."[48] Saba advances Count IV under *Blasius Industries, Inc. v. Atlas Corp.*[49] and *Schnell, Inc. v. Chris-Craft Industries, Inc.*[50]

On this pre-discovery record, Saba has not met its burden for mandatory injunctive relief on Count IV. The Trusts adopted Section 7 on a "clear day" before this proxy contest.[51] Proof that Defendants acted with the primary purpose of

---

[47] *Opportunity Partners L.P.*, 2015 WL 3582350, at *3.

[48] Am. Compl. ¶¶ 97-98.

[49] 564 A.2d 651, 661 (Del. Ch. 1988) (where boards act with "the primary purpose of impeding the exercise of stockholder voting power," they "bear[] the heavy burden of demonstrating a compelling justification for such action").

[50] 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

[51] *See AB Value Partners*, 2014 WL 7150465, at *3 (finding no evidence that an advance notice bylaw was applied "so as to make compliance impossible or extremely difficult,

thwarting Saba's nominees under *Blasius*, or otherwise acted inequitably under *Schnell*, requires more than merely laying out the timeline of Defendants' conduct and speculating about bad intent or purpose.[52] The lack of that proof is, in part, a mess of Saba's own making. Saba could have brought its claim weeks before it did. Saba was aware that it was unlikely to convince Defendants to relent on the Nomination Notices by at least May 10, when BQH filed its preliminary proxy statement. By waiting until early June to bring suit, Saba eliminated the opportunity to seek meaningful discovery before a hearing. Though I stop short of finding that

---

thereby thwarting" a proxy fight, where the bylaw was adopted "on a 'clear day' long before the present proxy challenge").

[52] *See generally MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1128 (Del. 2003) ("[J]udicial review under the deferential traditional business judgment rule standard is inappropriate when a board of directors acts for the primary purpose of impeding or interfering with the effectiveness of a shareholder vote, especially in the specific context presented in *Blasius* of a contested election for directors."); *Pell v. Kill*, 135 A.3d 764, 785 (Del. Ch. 2016) ("[T]he Delaware Supreme Court has made clear that *Blasius* is a form of enhanced scrutiny in which the compelling justification concept from that decision is applied within the enhanced standard of judicial review." (quotations omitted)); *Accipiter Life Scis. Fund, L.P. v. Helfer*, 905 A.2d 115, 125 (Del. Ch. 2006) ("Obviously, our courts have been more likely to find an action impermissible if the board acted with the intent of influencing or precluding a proxy contest for control of the corporation."); *Hubbard*, 1991 WL 3151, at *8 (stating that "*Blasius* . . . represent[s] a particularized application of the *Schnell* doctrine" and that "[b]ecause of the fundamental importance of shareholder voting rights to our system of corporate governance, *Blasius* may be viewed as holding that director conduct intended to interfere with or frustrate shareholder voting rights is presumptively inequitable and will be invalidated, unless the directors are able to rebut that presumption by showing a compelling justification for their actions"). "None of this is to say that relief from an inequitable bylaw is dependent on a finding of *scienter*" under a *Schnell* claim, but cases without a showing of intent or purpose tend to have "quite extraordinary" facts. *Accipiter Life Scis. Fund, L.P.*, 905 A.2d at 125.

Saba is guilty of laches at this stage due to its reasonable belief that BTZ's annual meeting would not be scheduled until late July, "[t]he emergency nature of [Saba's motion] is," to some degree, "a self-inflicted wound."[53]  Thus, while I leave open the possibility that the Questionnaire unduly restricted the shareholder franchise, Saba has not yet met its burden as to that or Defendants' intent.

## B. Saba Is At Risk Of Irreparable Harm.

Saba has demonstrated that it will suffer irreparable harm absent injunctive relief.  "Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors."[54]  "The shareholders' right to vote includes the right to nominate a contesting slate."[55]  Where a lack of injunctive relief "may well defeat the efforts of [stockholder] plaintiffs and the will of the majority of the stockholders" in a vote to elect board members, "[i]rreparable harm may be assumed."[56]

---

[53] *Moor Disposal Serv., Inc. v. Kent Cty. Levy Court*, 2007 WL 2351070, at *1 (Del. Ch. Aug. 10, 2007).

[54] *Hubbard*, 1991 WL 3151, at *5 (quoting *Int'l Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989)).

[55] *Id.* at *5.

[56] *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del. Ch. 1987).

### C.   The Balance Of Hardships Favors Injunctive Relief.

Defendants argue that the balance of hardships weighs against injunctive relief because of Saba's delay in bringing this suit and the related costs of soliciting additional votes and potentially issuing corrective disclosures in a short period of time.[57] "[T]here is little possibility of hardship to the individual defendants" because "[t]he incumbent directors have no vested right to continue to serve as directors and therefore will suffer no harm if they are defeated."[58] "If the will of the stockholders is thwarted, however, there may be considerable hardship to the stockholders and their corporation."[59] Moreover, Defendants set the BTZ meeting date after Saba filed its initial complaint, so costs related to its rapid approach are at least partly self-imposed.[60]

## III.   CONCLUSION

For the reasons above, the Court enjoins Defendants from applying Section 7(e)(ii) to invalidate Saba's nominations to the Boards based on the late return of Saba's Questionnaires. The Trusts shall count votes for those nominees at the annual

---

[57] Answering Br. 46-48.

[58] *Aprahamian*, 531 A.2d at 1208.

[59] *Id.*

[60] To the extent the Trusts elect to reconvene their annual meetings and re-solicit proxies, this Court has previously held "[t]hat harm is not substantial and can be mitigated by permitting [a company] to convene the [a]nnual [m]eeting for the sole purpose of adjourning it to [a] later date." *Opportunity Partners L.P.*, 2015 WL 3582350, at *4.

meetings. "As contemplated by Rule 65(d), this injunction is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise."[61]

No party has addressed security for the injunction. "[T]he party seeking security must support its application with facts or some realistic, as opposed to a yet-unproven, legal theory from which damages could flow to the party enjoined."[62] Nor have Defendants presented numerical evidence of the severity of any costs not subject to mitigation that may result from this injunction. As a result, the Court orders this injunction as of today.[63] The parties shall submit any affidavits in support of security by 12:00 p.m. on Monday, July 1, 2019.

To the extent an order is required for the foregoing to take effect, IT IS SO ORDERED. To the extent the parties require a separate order memorializing the injunction in this opinion, they may submit proposed orders (or, ideally, a joint proposed order) by 12:00 p.m. on Monday, July 1, 2019.

---

[61] *Id.* at *4.

[62] *Hill Int'l, Inc.*, 119 A.3d at 40 n.32 (affirming mandatory injunction not conditioned on the posting of security).

[63] *See Opportunity Partners L.P.*, 2015 WL 3582350, at *4 (finding mandatory injunction "not conditioned on the posting of any security").